# PENNSYLVANIA COAL COMPANY *v.* MAHON ET AL.

ERROR TO THE SUPREME COURT OF THE STATE OF PENNSYL-
VANIA.

No. 549. Argued November 14, 1922.—Decided December 11, 1922.

1. One consideration in deciding whether limitations on private prop-
erty, to be implied in favor of the police power, are exceeded, is
the degree in which the values incident to the property are dimin-
ished by the regulation in question; and this is to be determined
from the facts of the particular case. P. 413.

2. The general rule, at least, is that if regulation goes too far it will
be recognized as a taking for which compensation must be paid.
P. 415.

3. The rights of the public in a street, purchased or laid out by
eminent domain, are those that it has paid for. P. 415.

4. Where the owner of land containing coal deposits had deeded the
surface with express reservation of the right to remove all the coal
beneath, the grantees assuming the risk and waiving all claim to
damages that might arise from such mining, and the property
rights thus reserved, and contracts made, were valid under the
state law, and a statute, enacted later, forbade mining in such way
as to cause subsidence of any human habitation, or public street
or building, etc., and thereby made commercially impracticable the
removal of very valuable coal deposits still standing unmined, *held,*
that the prohibition exceeded the police power, whether viewed as
a protection to private surface owners or to cities having only
surface rights, and contravened the rights of the coal-owner under
the Contract Clause of the Constitution and the Due Process
Clause of the Fourteenth Amendment.[1] P. 413.

274 Pa. St. 489, reversed.

[1] The following summary of the statute involved is taken from the
opinion of the Pennsylvania Supreme Court:

The statute is entitled: "An act regulating the mining of anthra-
cite coal; prescribing duties for certain municipal officers; and im-
posing penalties."

Section 1 provides that it shall be unlawful "so to conduct the
operation of mining anthracite coal as to cause the caving-in, col-
lapse, or subsidence of (a) Any public building or any structure cus-

ERROR to a decree of the Supreme Court of Pennsylvania, for the defendants in error, in their suit to enjoin the Coal Company from mining under their property in such way as to remove supports and cause subsidence of the surface and of their house.

*Mr. John W. Davis* with whom *Mr. Frank W. Wheaton,* *Mr. Henry S. Drinker, Jr.,* and *Mr. Reese H. Harris* were on the brief, for plaintiff in error.

I. The statute impairs the obligation of the contract between the parties.

On August 26, 1921, the Mahons were bound by a valid covenant to permit the Coal Company, which had sold to them or to their ancestor the surface rights only in their lot, to exercise without objection or hindrance

---

tomarily used by the public as a place of resort, assemblage, or amusement, including, but not being limited to, churches, schools, hospitals, theatres, hotels, and railroad stations; (b) Any street, road, bridge, or other public passageway, dedicated to public use or habitually used by the public; (c) Any track, roadbed, right of way, pipe, conduit, wire, or other facility, used in the service of the public by any municipal corporation or public service company as defined by the Public Service Company Law; (d) Any dwelling or other structure used as a human habitation, or any factory, store, or other industrial or mercantile establishment in which human labor is employed; (e) Any cemetery or public burial ground."

Sections 2 to 5, inclusive, place certain duties on public officials and persons in charge of mining operations, to facilitate the accomplishment of the purpose of the act.

Section 6 provides the act "shall not apply to [mines in] townships of the second class [i. e., townships having a population of less than 300 persons to a square mile], nor to any area wherein the surface overlying the mine or mining operation is wild or unseated land, nor where such surface is owned by the owner or operator of the underlying coal and is distant more than one hundred and fifty feet from any improved property belonging to any other person."

Section 7 sets forth penalties; and § 8 reads: "The courts of common pleas shall have power to award injunctions to restrain violations of this act." P. L. 1921, p. 1198.

by them, its reserved right to mine out all the coal, without liability to them for damages occasioned thereby, which damages had been expressly waived as a condition for the grant. On August 27, 1921, the statute completely annulled this covenant, by giving them the right, by injunction, to prevent such mining. The fact that this contract was contained in a deed of conveyance does not make it any the less a contract within the constitutional protection. A deed is a contract between the parties thereto, even though the grantor is a sovereign State. *Fletcher* v. *Peck*, 6 Cr. 87, 137; *Ohio Trust Co.* v. *Debolt*, 16 How. 416, 432.

II. The statute takes the property of the Coal Company without due process of law.

Whenever the use of the land is restricted in any way or some incorporeal hereditament is taken away which was appurtenant thereto, it constitutes as much a taking as if the land itself had been appropriated. Tiedeman, State and Federal Control of Real and Personal Property, p. 702, § 143; *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166; *Commonwealth* v. *Clearview Coal Co.*, 256 Pa. St. 238.

If an act would be unconstitutional which specifically required one-third of the coal to be left in place to support the surface, it is in no way saved by the subterfuge of permitting the mining, provided this does not cause the subsidence which will inevitably result unless the Coal Company provides artificial support at a cost exceeding the value of the coal. The theoretical right to remove the coal without disturbing the surface is, as a practical matter, no more available than was Shylock's right to his pound of flesh.

As pointed out in Justice Kephart's dissenting opinion, the courts of Pennsylvania have recognized three distinct estates in mining property: (1) The right to use the surface; (2) the ownership of the subjacent minerals; (3) the right to have the surface supported by the subjacent strata.

This third right, called the Third Estate, has been recognized as so distinct from the ownership of the surface or of the minerals that it may be transferred to and held or conveyed by one who was neither the owner of the surface nor of the coal. *Penman v. Jones,* 256 Pa. St. 416; *Charnetski v. Coal Co.,* 270 Pa. St. 459; *Young v. Thompson,* 272 Pa. St. 360.

III. The statute is not a *bona fide* exercise of the police power.

With the swing of the popular pendulum during recent years, the descendants of the able lawyers who, forty years ago, were employed to draft special legislation, are now employed in drafting laws to evade the restrictions of the state and federal constitutions. This legislation divides itself generally into two classes. In the first class fall those laws which are prompted by upright and public spirited progressives who, impelled by the need for the immediate adoption of the reforms which they advocate, are impatient at the constitutional restrictions on federal and state power, and are unwilling to await the enlargement of such powers by constitutional amendment. Examples of this class of law are the two recent Child Labor Acts.

The second class consists of laws passed at the insistence of a determined and organized minority, designed to confiscate for their benefit the rights of producers of property, and passed by a legislature in time of political stress, in its anxiety to secure the votes controlled by the advocates of the measure. Such a law, we submit, is the Kohler Act. To protect a complaisant public from such laws is one of the primary functions of the courts.

When it is asserted that a statute is not what the legislature sought to have it appear, it is necessary for those attacking its constitutionality to point, in the statute itself, to evidences which, viewed in the light of the court's knowledge of human nature and of legislative practice, are sufficient to demonstrate the position taken.

So tested, the Kohler Act is in reality what this Court in *Loan Association* v. *Topeka,* 20 Wall. 655, characterized as "not legislation," but "robbery under the forms of law."

It will be observed that the favored expedient of the draughtsmen of legislation of either of the classes to which we have alluded, is to dress up their statute in the garb of a statute properly coming within one of the recognized powers of the legislative body enacting it.

The Kohler Act speaks as a regulation of the mining of anthracite coal, to protect the lives and safety of the public. It begins with a vivid preamble, from which it would appear that a considerable part of the population of Pennsylvania is in immediate danger of the loss of life and limb by being incontinently projected into unexpected abysses formed by the sudden subsidence of the surface by reason of the mining of anthracite coal. In his dissenting opinion, however, Mr. Justice Kephart states that the actual damage to date is confined to a small portion of the City of Scranton. Anthracite mining, however, is conducted in nine counties under a surface area comprising 496 square miles. While this preamble may possibly be regarded as spontaneous expression by the legislature of the reasons for the passage of the act, we call attention to the fact that an honest and valid law needs no specious preamble to bolster up its constitutionality. Is it not an equally plausible explanation of the preamble that the framers of this act knew full well that it was not really a police regulation and were seeking to coerce the courts into holding it to be such merely by affixing to it a label?

The act also contains a clause emphasizing that it is remedial legislation and craving a broad construction, which, if the act is what it says it is, will not help it, but which, if it is really a confiscatory measure masquerading as a police regulation, merely serves to emphasize this

feature. The preamble and § 9 are the hand of Esau. Section 1 is the voice of Jacob. *Dobbins* v. *Los Angeles,* 195 U. S. 223; *Lawton* v. *Steele,* 152 U. S. 133.

Does the interest of the public generally, as distinguished from the private interest of Mr. and Mrs. Mahon, require that they shall be under no necessity of removing temporarily from their dwelling while the mining under their lot is going on, or of themselves making the necessary expenditures to repair their house and to fill up the cracks in their sidewalk and lawn after the subsidence is completed, using that part of the purchase money which they saved by buying the lot without the right of support?

Are the drastic prohibitions of § 1 reasonably necessary to protect the lives and safety of persons on the Mahon lot or are they unduly oppressive on the Coal Company?

The act shows on its face that its purpose is not to protect the lives or safety of the public generally but merely to augment the property rights of a favored few.

Genuine public streets or public property where the right of support is vested in the public, as well as private property, where such support has not been sold, have been amply protected. Under the Mine Law of 1891 (3 Purd. 2555), the Davis Act (Act of July 26, 1913, P. L. 1439; 6 Purd. 6626) maps of underground workings, both past and prospective, must be filed with State Inspectors and City and Borough Mine Bureaus. Any citizen can at any time determine whether his underlying support is jeopardized. Actual inspection is always available and injunctions easily obtainable. See *Scranton* v. *Peoples Coal Co.,* 256 Pa. St. 332; 274 Pa. St. 63. All this was true before the Kohler Act.

The only interests not heretofore fully protected both by the right to damages and to injunctive relief, were those individuals who were owners of surface rights merely, and whose right of subjacent support had been

withheld or waived, presumably for adequate considera-
tion, or public or quasi-public bodies who, instead of
condemning their streets or school buildings and thus
paying for and securing the permanent support of the
underlying coal, have obtained them at a bargain from
parties who acquired only restricted title such as the
Mahons possess. The right of such surface owners, the
courts of Pennsylvania have properly held, can rise no
higher than that of their grantor, no matter whether
the present holder be a public service corporation op-
erating water pipes, *Spring Brook Water Co.* v. *Pennsyl-
vania Coal Co.*, 54 Pa. Super. Ct. 380; a school district
which has erected its building on a lot acquired without
the right of support, *Commonwealth* v. *Clearview Coal
Co.*, 256 Pa. St. 328; or a city which has similarly ac-
quired its streets by dedication from one who himself
had no right of support, *Scranton* v. *Phillips,* 57 Pa.
Super. Ct. 633.

Apart from the consideration that the lives and safety
of such classes of persons and those whom they permit
to come on their property need no protection other than
a proper notice to remove temporarily until it becomes
safe to return, it is obvious that the Kohler Act is not
directed to the safety of the public, but is for the benefit
solely of a particular class.

That there may be other private persons in a situation
similar to that of these plaintiffs merely makes the act for
the benefit of a particular *class* of individuals, and not for
the benefit of the public generally.

A further feature of the Kohler Act which demonstrates
that it was not enacted for the protection of the general
public is that by its terms it does not apply to all those
similarly endangered. The life or safety of a surface
owner is obviously subjected to equal jeopardy irrespective
of whether the hole into which he falls was formed by the
mining of bituminous or anthracite coal, or, for that mat-

ter, of iron ore, quartz or gravel. The Kohler Act, however, applies only to subsidences caused by the mining of anthracite coal.

A further evidence that the act is disingenuous is found in § 5. If it were really to protect life and safety, the municipal authorities would naturally be empowered, in case of threatened subsidence, to rope off the endangered area and to compel the occupants to vacate the premises. Instead, they are merely empowered to shut up the mine and to exclude the workmen therefrom.

Further legislative evidence of the true purpose is found in the provisions of another statute, passed on the same day and conceded to be its twin measure. This is the so-called Fowler Act, discussed in the dissenting opinion. There could be no clearer demonstration than that afforded by the intrinsic evidence of these two interrelated acts, that the sole design of the framers of both was to coerce the coal companies either into donating to the surface owner sufficient coal in place to support the surface, or paying him the damages which, as a means of getting a cheap lot, he had expressly bargained away.

The means adopted by the Kohler Act are not reasonably necessary for the accomplishment of its ostensible purpose, and are unduly oppressive upon individuals.

IV. If surface support in the anthracite district is necessary for public use, it can constitutionally be acquired only by condemnation with just compensation to the parties affected. *Commonwealth* v. *Clearview Coal Co.,* 256 Pa. St. 328; *Raub* v. *Lackawanna County,* 60 Pa. Super. Ct. 462; *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Wisconsin,* 238 U. S. 491.

The Barrier Pillar Law, involved in *Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531, in no sense operates to transfer, without compensation, a permanent property right or easement from one party to another. The compensation to each owner for the burden of maintaining

the pillar on his side is found in the reciprocal benefit from the pillar maintained by his neighbor. See *Bowman* v. *Ross,* 167 U. S. 548. Furthermore, it obviously has a direct relation to the lives and safety of men working in coal mines. The restriction imposed is but temporary and incidental; it applies to but a very small part of the coal at a point along the land line, where it may well be left in place without interfering with the operation until both mines are almost exhausted, whereupon, as the Court doubtless knows, the adjoining owners enter into an agreement to remove the pillar.

The Rent Cases (*Block* v. *Hirsh,* 256 U. S. 135; *Marcus Brown Holding Co.* v. *Feldman,* 256 U. S. 170; *Levy Leasing Co.* v. *Siegel,* 258 U. S. 242) are not authority for the proposition that a property right of one may under the police power be transferred to another without compensation, even in time of emergency. Quite the contrary.

The principle involved in these cases was, it is submitted, not the police power but that of eminent domain. When the State regulates railroad rates, the fair return which the Constitution guarantees to the stockholders is really, when analysed, the just compensation required in condemnation proceedings. Instead of condemning a perpetual lease on the railroad with a fair rental for the stockholders and then operating the road at cost for the use of the entire public, the government allows the stockholders to operate it but requires them to serve the whole public without discrimination and permits them to net only the reasonable return to which their fair rental would have amounted. There is thus an essential difference in kind between a safety appliance act and a rate regulation. The one is an exercise of the police power, a prohibition of something injurious to the public, without the transfer of any property or property right of another either with or without compensation. The other is in its

45646°—23——26

essence an exercise of the power of eminent domain, in-volving not only the requirement that it be for the public benefit as distinguished from that of a privileged class, but also the requirement of just compensation. Such were the Rent Laws. The majority opinion disclaimed the introduction of any new principle of constitutional law; it merely held applicable a recognized rule to the admitted facts of the case. There has never been any doubt that a railroad company can be prohibited from charging more than reasonable rates, or that it can be precluded from putting one passenger off its trains to make room for another who is willing to pay a higher fare. There was no suggestion in the arguments or in the minority opinion that the means adopted were not necessary and appropriate to remedy the existing evil or that any other method was available to produce the same result which would be attended with less hardship to the landlords. Nor was there any attempt by the law to require the landlord to give the use of his property for nothing, nor any thought that the tenant should get something for nothing. All that the law did was, in view of the temporary suspension of the law of supply and demand, temporarily to suspend the landlord's arbitrary right of extortion, the power to exercise which was the direct and temporary result of the national crisis.

Even if it appeared that the owners of all the coal under buildings having no contractual right of support, intended presently to remove it, there would be no analogy to the conditions on which the validity of the Rent Laws was based, since there is no thought or suggestion that all the available dwellings, theatres, hotels and cemeteries are situated over such mines.

The Rent Laws were merely a temporary measure. They provided reasonable compensation to the landlord; they constituted virtually a condemnation by the sovereign of the term to November 1, 1922, and a transfer of

this term to the tenant at a reasonable cost, the just compensation provided by the Constitution.

.The Kohler Act, however, is a permanent provision. It transfers for all time the Third Estate,—the right to the perpetual use of this coal—in the Mahon lot from the Coal Company to private individuals, and that without any compensation whatever.

In the court below, counsel, in discussing the Rent Cases, contended that the justification for the Kohler Act is even stronger than for the Rent Laws, insomuch as the latter were merely to provide housing facilities, a necessity of life, whereas the Kohler Act is to " protect life itself." The obvious answer to this specious argument is, first, that the Kohler Act is on its face unnecessary to protect the lives of Mr. and Mrs. Mahon, and will be effective to that end only in case they neglect to take the precautions for their own protection which their restricted rights in their property demand that they shall take. Second, there is no rule of law which entitles a State, even to protect life itself, to transfer the property of one citizen without compensation to another.

Just here comes into force the distinction between the police power and the power of eminent domain, so clearly stated in a recent decision by the writer of the majority opinion in the case at bar—*Jackman* v. *Rosenbaum Co.*, 263 Pa. St. 158, 166.

An owner of dangerous drugs may, under the police power, be restricted from selling them without a license, or without a prescription, or may even be prohibited from selling them at all. This would constitute an exercise of the police power.

In time of epidemic it is conceivable that a State might temporarily prohibit the hoarding of essential medicines and might require physicians and druggists to sell them at reasonable rates. Even at such a time, the drug-

gist could not be required to dispense his medicines for nothing, or a baker his bread, and that though people were dying or starving for want of drugs and food.

If every word in the preamble of the Kohler Act were true there would still be no justification for the uncompensated transfer of the beneficial use of the supporting coal from defendant to plaintiff. No emergency will justify the transfer of property or a tangible property right from one citizen to another without just compensation.

The Kohler Act is not a police regulation. It is not a valid exercise of the right of eminent domain because, first, it is not exercised for the benefit of the public generally, and second, because it provides no compensation whatever to the party whose property is taken.

Mr. W. L. Pace, with whom Mr. H. J. Mahon was on the brief, for defendants in error.

Mr. George Ross Hull, with whom Mr. George E. Alter, Attorney General of the State of Pennsylvania, was on the brief, for the State of Pennsylvania, by special leave of court, as amici curiae.

The problem presented to the legislature involved the interests of the public in the life, health and safety of persons living in the mining communities, in the wholesale destruction of surface property, and in securing the maximum yield of coal from the mines; the interest of the surface owner in his property and of the surface dweller in his own safety; the interest of the mine owner in his labor supply and in securing the maximum yield of coal from his property. This problem after elaborate investigation, and abortive attempts, was sought to be met by the "Fowler Act," 1921, P. L. 1192, establishing the State Anthracite Mine Cave Commission and the "Kohler Act," id. 1198, here involved.

As was said by Mr. Chief Justice von Moschzisker, in this case: "In determining whether the act is a reason-

able piece of legislation within the police power, we may ' call to our aid all those external or historical facts which are necessary for this purpose and which led to the enact- ment.' "

A reading of the Kohler Act involved in this appeal discloses that it is not directed to the reimbursement of surface owners for damage which may be caused either to persons or property, but is directed solely to the pro- tection of human life. There are probably millions of dollars in surface improvements which are not reached and which were not intended to be reached by the provi- sions of this act.· In view of the historical facts it is apparent that the good faith of this exercise of the police power is beyond question.

The legislative determination of the existence of a situation inimical to the public welfare which calls for an exercise of the police power, while it may be scrutinized by the courts, is not to be set aside unless it clearly appear that such determination was not well founded. *Lawton* v. *Steele,* 152 U. S. 133; *McLean* v. *Arkansas,* 211 U. S. 539; *Lower Vein Coal Co.* v. *Industrial Board,* 255 U. S. 144; *Nolan* v. *Jones,* 263 Pa. St. 124; *Levy Leasing Co.* v. *Siegel,* 258 U. S. 242.

The protection of the life, health and safety of the public in the anthracite mining communities is the pri- mary purpose of the act. Its interference with property rights is merely incidental. *Commonwealth* v. *Alger,* 7 Cush. 84; *Holden* v. *Hardy,* 169 U. S. 392.

Land which is underlaid with coal is a kind of property which, by reason of operations conducted upon it or by reason of contracts made with respect to it, may become a grave menace to the life, health and safety of the public.

The dangers incident to operations conducted on coal lands have been met by extensive and elaborate codes of laws regulating coal mining. The constitutionality of these laws has long since been settled. The danger to

the public arising from the contracts entered into with respect to coal lands, however, was not clearly recognized until recent years.

As the law relating to coal lands developed prior to the enactment of the Kohler Act, it permitted the creation, by appropriate conveyances, of three distinct property rights or estates in lands: (1) the surface, (2) the coal, and (3) the right of support; and these estates might be vested in different persons at the same time. *Graff Furnace Co.* v. *Scranton Coal Co.*, 244 Pa. St. 592; *Penman* v. *Jones*, 256 Pa. St. 416; *Charnetski* v. *Coal Mining Co.*, 270 Pa. St. 459. Owners in fee of coal lands might part with their right to the surface, reserving to themselves the right to mine all of the coal without any obligation to support the surface and without liability for any damage resulting from its subsidence.

It is probable that when conveyances of surface rights were first made, the right to remove coal without liability to the surface owners was reserved merely as a safeguard against an occasional injury which might occur through first mining; and that second mining, or the removal of pillars, was not then in contemplation. The large extent of territory underlaid with anthracite coal, the large number of people living upon its surface, and the very obvious menace to the life, health and safety of these people, clothed these lands and these mining operations with a public interest which manifestly made them a proper subject for the exercise of the police power. If the public welfare be threatened by the existence or the certain occurrence of a grave public danger the legality of an exercise of the police power to prevent or to remedy cannot be questioned.

The exercise of the police power to regulate contracts relating to land has been sustained where the disaster threatened was of less serious consequence than that which is dealt with in the act now under consideration.

*Block* v. *Hirsh*, 256 U. S. 135; *Levy Leasing Co.* v. *Siegel*, 258 U. S. 242.

It will be urged, however, that these cases are not applicable to the case now under consideration, for the reason that in them the acts involved were emergency laws passed to meet an urgent temporary necessity and expressly limited by their terms to a brief period. Ordinarily the operation of economic laws regulates the supply of houses so that dwellings for rent are not clothed with such a public interest as would subject the contracts of landlord and tenant to the regulatory exercise of the police power. The nature of the property, the rights in it and the contracts relating to it, are such that regulation of the character contained in those acts could be justified only by the existence of extraordinary circumstances which the legislature and the courts knew must disappear when the emergency passed. But we do not understand the Court to mean that if a situation which threatened the public safety and welfare might be dealt with in an emergency, it could not be controlled by appropriate regulation if that emergency continued. The sound reason which sustained the validity of those acts during the period when the emergency was reasonably expected to continue will sustain as a permanent change an act which is intended to meet a permanent menace to the public. Accordingly the same fundamental principles of law which sustained the rent laws during the period of emergency, will sustain the Kohler Act.

It should be noted also in considering the application of the rent cases, that the case at bar falls within a class of cases which the dissenting opinion recognized as proper for the exercise of the police power. *Block* v. *Hirsh*, 256 U. S. 135, 167.

The Kohler Act is in line with numerous familiar cases wherein legislation involving the exercise of the police power has been sustained. The well established restric-

tion placed upon the right of public service companies to fix rates by contract, the power to forbid absolutely the sale of oleomargarine for the purpose of preventing possible frauds, the power to prevent the sale of unwholesome meats and other foods, the power to regulate or prohibit the manufacture of corn and rye into whiskey, the power to forbid mining to the boundary of a mine property without leaving a barrier pillar of sufficient thickness to prevent possible injury from the flooding of an adjoining mine, are familiar illustrations of the exercise of the police power enacted to avoid dangers which are neither so grave nor so certain as those which the Kohler Act seeks to prevent.

In its application to all coal lands where the right of surface support is still vested in the surface owner, the effect of the Kohler Act is to prevent the making of any valid contract whereby the right of support may be separated from the surface ownership in such manner as to permit the subsidence of any of the structures or facilities mentioned in the act. It must be remembered that there is a broad field in which the Kohler Act does thus operate. If the circumstances which now exist in the anthracite regions could have been foreseen and certainly predicted by the legislature a half century ago, it would clearly have been within its power to limit the owner's right to contract, by the enactment of such a regulatory measure as the Kohler Act. And we are confident that if it were not for the existence of contracts already entered into, the constitutionality of this act would not have been questioned.

It is an act, prospective in its operation, regulating the future conduct of mining for anthracite coal. It operates generally upon all mines, including those now being operated and all which may be opened and operated in the future. It operates without regard to any private contracts which may have been made relating to surface sup-

port. It operates alike upon lands where the surface owner still has the right of support, and upon those where the right of support has been separated from ownership of the surface and is held by the owner of the coal or by a third person.

But if the act in its operation upon lands where the right of support and the ownership of the surface have not been separated, be a constitutional exercise of the police power, it is equally valid in its operation upon lands where these interests are held by different persons.

Persons cannot remove their property from the reach of the police power by entering into contracts with respect to it. *Marcus Brown Holding Co.* v. *Feldman,* 256 U. S. 170.

All property within the State is held, and all contracts are entered into subject to the future exercise of the police power of the State. Every such agreement was entered into by the parties with full knowledge that whenever the existence of such contracts and the exercise of the license reserved should threaten the life, health or safety of the people, the Commonwealth in its sovereign power might interpose and restrict the use of those contract rights to such extent as might be necessary in the public interest. Owners of coal lands, who saw highways being laid out and improved, railroads and trolley lines built, sewers and gas mains laid, light, telephone and power wires stretched overhead, depots, stores, theatres, hotels and dwellings constructed, and who, perhaps as many of the coal companies did, laid out the surface in building lots dedicating streets and alleys to public use, selling the lots for the purpose of having dwellings erected thereon,—such owners were bound to know that whenever the time should come when the exercise of the license which they had reserved would threaten the welfare of the communities upon the surface, the police power of the State might be interposed to restrict their rights. *Scranton* v. *Public*

*Service Commission,* 268 Pa. St. 192; *Relief Electric Light, Heat & Power Company's Petition,* 69 Pa. Super Ct. 1, 8.

In *Russell* v. *Sebastian,* 233 U. S. 195, and *New Orleans Gas Light Co.* v. *Louisiana Light Co.,* 115 U. S. 650, no exercise of the police power was involved; in the latter, this Court recognized the principle which we have stated.

The Kohler Act does not take the property of the plaintiff in error. *Commonwealth* v. *Plymouth Coal Co.,* 232 Pa. St. 141; s. c. 232 U. S. 531. The act does not go as far as the Barrier Pillar Act. It contains no provision requiring any mine owner to leave coal in place. If natural support other than coal in the pillars be available, or if artificial support be provided, every pound of coal may be removed from the mines.

Nor does it transfer the right of support from the owner of the coal to the surface owner. This right, license or estate in the land is nothing more than an immunity from civil liability for damages to the surface owner. Under the Kohler Act, this immunity continues.

If the act were designed, as the plaintiff in error contends, for the protection of the property rights of the surface owners, and not as a *bona fide* and reasonable exercise of the police power, it would contain two features which are conspicuously absent from it: First, it would provide that the liability of the defendant for damages to the person or property of the plaintiffs which was released by the contract contained in the deed, should be restored; second, it would apply generally to all valuable structures upon the surface.

Notice to the surface owner to vacate his property is not sufficient to prevent injury to him or to the public. This same objection might have been made to the reasonableness of all of the legislation which has been enacted for the protection of persons employed in mines. Communities must exist in or near the vicinity of the mines or they cannot be operated, and it is a matter of concern to

the public that persons be permitted to dwell there in
safety.   Even if it were possible to remove whole cities
from their present locations, and reconstruct them upon
sites beyond the coal measures, those sites may be so
distant from the mines and so separated by the topog-
raphy of the country that access to and from the col-
lieries would be impracticable and the mines would close
for want of labor.   Moreover, cities are built where nature
affords an opportunity for them.   Industrial communi-
ties cannot be perched upon the mountains nor in places
inaccessible to roads and railroads.   Nor is it always prac-
ticable or possible for the individual dweller upon the
surface to find another house in which to live.   Through-
out the State of Pennsylvania and elsewhere in this and
foreign countries there is an acute shortage of houses
due to conditions prevailing during the war, and there
is no doubt that this condition, which has elsewhere
proven so serious as to give rise to the legislation re-
viewed in the Rent Cases (already cited), has been ag-
gravated in the coal mining communities by reason of
the very conditions which gave rise to the Kohler Act.
Or it may be that the occupants of the dwelling will reck-
lessly disregard the notice given and take the chance of
escaping injury.   The notice will not avail to prevent the
disastrous results of his necessity or folly.   See *Common-
wealth* v. *Plymouth Coal Co.,* 232 Pa. St. 141, 146.

The only practicable way in which the life, health
and safety of the public in these communities may be
adequately safeguarded is by the enforcement of such
restrictions as are contained in the Kohler Act, and for
this reason those restrictions are reasonable even though
they limit to some extent the rights of others.

*Mr. Philip V. Mattes,* by leave of court, filed a brief
on behalf of the City of Scranton, as *amicus curiae.*

*Mr. Philip V. Mattes, Mr. Frank M. Walsh* and *Mr.
Owen J. Roberts,* by leave of court, filed a brief on behalf

of the Scranton Surface Protective Association, as *amici curiae.*

*Mr. C. La Rue Munson* and *Mr. Edgar Munson*, by leave of court, filed a brief on behalf of the Scranton Gas & Water Company, as *amici curiae.*

MR. JUSTICE HOLMES delivered the opinion of the Court.

This is a bill in equity brought by the defendants in error to prevent the Pennsylvania Coal Company from mining under their property in such way as to remove the supports and cause a subsidence of the surface and of their house. The bill sets out a deed executed by the Coal Company in 1878, under which the plaintiffs claim. The deed conveys the surface, but in express terms reserves the right to remove all the coal under the same, and the grantee takes the premises with the risk, and waives all claim for damages that may arise from mining out the coal. But the plaintiffs say that whatever may have been the Coal Company's rights, they were taken away by an Act of Pennsylvania, approved May 27, 1921, P. L. 1198, commonly known there as the Kohler Act. The Court of Common Pleas found that if not restrained the defendant would cause the damage to prevent which the bill was brought, but denied an injunction, holding that the statute if applied to this case would be unconstitutional. On appeal the Supreme Court of the State agreed that the defendant had contract and property rights protected by the Constitution of the United States, but held that the statute was a legitimate exercise of the police power and directed a decree for the plaintiffs. A writ of error was granted bringing the case to this Court.

The statute forbids the mining of anthracite coal in such way as to cause the subsidence of, among other

things, any structure used as a human habitation, with certain exceptions, including among them land where the surface is owned by the owner of the underlying coal and is distant more than one hundred and fifty feet from any improved property belonging to any other person. As applied to this case the statute is admitted to destroy previously existing rights of property and contract. The question is whether the police power can be stretched so far.

Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature, but it always is open to interested parties to contend that the legislature has gone beyond its constitutional power.

This is the case of a single private house. No doubt there is a public interest even in this, as there is in every purchase and sale and in all that happens within the commonwealth. Some existing rights may be modified even in such a case. *Rideout* v. *Knox,* 148 Mass. 368. But usually in ordinary private affairs the public interest does not warrant much of this kind of interference. A source of damage to such a house is not a public nuisance even if similar damage is inflicted on others in different places. The damage is not common or public. *Wesson* v. *Washburn Iron Co.,* 13 Allen, 95, 103. The extent of

the public interest is shown by the statute to be limited, since the statute ordinarily does not apply to land when the surface is owned by the owner of the coal. Furthermore, it is not justified as a protection of personal safety. That could be provided for by notice. Indeed the very foundation of this bill is that the defendant gave timely notice of its intent to mine under the house. On the other hand the extent of the taking is great. It purports to abolish what is recognized in Pennsylvania as an estate in land—a very valuable estate—and what is declared by the Court below to be a contract hitherto binding the plaintiffs. If we were called upon to deal with the plaintiffs' position alone, we should think it clear that the statute does not disclose a public interest sufficient to warrant so extensive a destruction of the defendant's constitutionally protected rights.

But the case has been treated as one in which the general validity of the act should be discussed. The Attorney General of the State, the City of Scranton, and the representatives of other extensive interests were allowed to take part in the argument below and have submitted their contentions here. It seems, therefore, to be our duty to go farther in the statement of our opinion, in order that it may be known at once, and that further suits should not be brought in vain.

It is our opinion that the act cannot be sustained as an exercise of the police power, so far as it affects the mining of coal under streets or cities in places where the right to mine such coal has been reserved. As said in a Pennsylvania case, " For practical purposes, the right to coal consists in the right to mine it." *Commonwealth* v. *Clearview Coal Co.*, 256 Pa. St. 328, 331. What makes the right to mine coal valuable is that it can be exercised with profit. To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it. This

we think that we are warranted in assuming that the statute does.

It is true that in *Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531, it was held competent for the legislature to require a pillar of coal to be left along the line of adjoining property, that, with the pillar on the other side of the line, would be a barrier sufficient for the safety of the employees of either mine in case the other should be abandoned and allowed to fill with water. But that was a requirement for the safety of employees invited into the mine, and secured an average reciprocity of advantage that has been recognized as a justification of various laws.

The rights of the public in a street purchased or laid out by eminent domain are those that it has paid for. If in any case its representatives have been so short sighted as to acquire only surface rights without the right of support, we see no more authority for supplying the latter without compensation than there was for taking the right of way in the first place and refusing to pay for it because the public wanted it very much. The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. *Hairston* v. *Danville & Western Ry. Co.,* 208 U. S. 598, 605. When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. It may be doubted how far exceptional cases, like the blowing up of a house to stop a conflagration, go—and if they go beyond the general rule,

whether they do not stand as much upon tradition as upon principle. *Bowditch* v. *Boston,* 101 U. S. 16. In general it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders. *Spade* v. *Lynn & Boston R. R. Co.,* 172 Mass. 488, 489. We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. As we already have said, this is a question of degree—and therefore cannot be disposed of by general propositions. But we regard this as going beyond any of the cases decided by this Court. The late decisions upon laws dealing with the congestion of Washington and New York, caused by the war, dealt with laws intended to meet a temporary emergency and providing for compensation determined to be reasonable by an impartial board. They went to the verge of the law but fell far short of the present act. *Block* v. *Hirsh,* 256 U. S. 135. *Marcus Brown Holding Co.* v. *Feldman,* 256 U. S. 170. *Levy Leasing Co.* v. *Siegel,* 258 U. S. 242.

We assume, of course, that the statute was passed upon the conviction that an exigency existed that would warrant it, and we assume that an exigency exists that would warrant the exercise of eminent domain. But the question at bottom is upon whom the loss of the changes desired should fall. So far as private persons or communities have seen fit to take the risk of acquiring only surface rights, we cannot see that the fact that their risk has become a danger warrants the giving to them greater rights than they bought.

*Decree reversed.*

MR. JUSTICE BRANDEIS, dissenting.

The Kohler Act prohibits, under certain conditions, the mining of anthracite coal within the limits of a city in such a manner or to such an extent " as to cause the . . .

subsidence of any dwelling or other structure used as a human habitation, or any factory, store, or other industrial or mercantile establishment in which human labor is employed." Coal in place is land; and the right of the owner to use his land is not absolute. He may not so use it as to create a public nuisance; and uses, once harmless, may, owing to changed conditions, seriously threaten the public welfare. Whenever they do, the legislature has power to prohibit such uses without paying compensation; and the power to prohibit extends alike to the manner, the character and the purpose of the use. Are we justified in declaring that the Legislature of Pennsylvania has, in restricting the right to mine anthracite, exercised this power so arbitrarily as to violate the Fourteenth Amendment?

Every restriction upon the use of property imposed in the exercise of the police power deprives the owner of some right theretofore enjoyed, and is, in that sense, an abridgment by the State of rights in property without making compensation. But restriction imposed to protect the public health, safety or morals from dangers threatened is not a taking. The restriction here in question is merely the prohibition of a noxious use. The property so restricted remains in the possession of its owner. The State does not appropriate it or make any use of it. The State merely prevents the owner from making a use which interferes with paramount rights of the public. Whenever the use prohibited ceases to be noxious,—as it may because of further change in local or social conditions,—the restriction will have to be removed and the owner will again be free to enjoy his property as heretofore.

The restriction upon the use of this property can not, of course, be lawfully imposed, unless its purpose is to protect the public. But the purpose of a restriction does not cease to be public, because incidentally some private

persons may thereby receive gratuitously valuable special benefits.. Thus, owners of low buildings may obtain, through statutory restrictions upon the height of neighboring structures, benefits equivalent to an easement of light and air. *Welch* v. *Swasey*, 214 U. S. 91. Compare *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61; *Walls* v. *Midland Carbon Co.*, 254 U. S. 300. Furthermore, a restriction, though imposed for a public purpose, will not be lawful, unless the restriction is an appropriate means to the public end. But to keep coal in place is surely an appropriate means of preventing subsidence of the surface; and ordinarily it is the only available means. Restriction upon use does not become inappropriate as a means, merely because it deprives the owner of the only use to which the property can then be profitably put. The liquor and the oleomargarine cases settled that. *Mugler* v. *Kansas*, 123 U. S. 623, 668, 669; *Powell* v. *Pennsylvania*, 127 U. S. 678, 682. See also *Hadacheck* v. *Los Angeles*, 239 U. S. 394; *Pierce Oil Corporation* v. *City of Hope*, 248 U. S. 498. Nor is a restriction imposed through exercise of the police power inappropriate as a means, merely because the same end might be effected through exercise of the power of eminent domain, or otherwise at public expense. Every restriction upon the height of buildings might be secured through acquiring by eminent domain the right of each owner to build above the limiting height; but it is settled that the State need not resort to that power. Compare *Laurel Hill Cemetery* v. *San Francisco*, 216 U. S. 358; *Missouri Pacific Ry. Co.* v. *Omaha*, 235 U. S. 121. If by mining anthracite coal the owner would necessarily unloose poisonous gasses, I suppose no one would doubt the power of the State to prevent the mining, without buying his coal fields.. And why may not the State, likewise, without paying compensation, prohibit one from digging so deep or excavating so near the surface, as to expose the community to

like dangers? In the latter case, as in the former, carrying on the business would be a public nuisance.

It is said that one fact for consideration in determining whether the limits of the police power have been exceeded is the extent of the resulting diminution in value; and that here the restriction destroys existing rights of property and contract. But values are relative. If we are to consider the value of the coal kept in place by the restriction, we should compare it with the value of all other parts of the land. That is, with the value not of the coal alone, but with the value of the whole property. The rights of an owner as against the public are not increased by dividing the interests in his property into surface and subsoil. The sum of the rights in the parts can not be greater than the rights in the whole. The estate of an owner in land is grandiloquently described as extending *ab orco usque ad coelum.* But I suppose no one would contend that by selling his interest above one hundred feet from the surface he could prevent the State from limiting, by the police power, the height of structures in a city. And why should a sale of underground rights bar the State's power? For aught that appears the value of the coal kept in place by the restriction may be negligible as compared with the value of the whole property, or even as compared with that part of it which is represented by the coal remaining in place and which may be extracted despite the statute. Ordinarily a police regulation, general in operation, will not be held void as to a particular property, although proof is offered that owing to conditions peculiar to it the restriction could not reasonably be applied. See *Powell* v. *Pennsylvania,* 127 U. S. 678, 681, 684; *Murphy* v. *California,* 225 U. S. 623, 629. But even if the particular facts are to govern, the statute should, in my opinion, be upheld in this case. For the defendant has failed to adduce any evidence from which

it appears that to restrict its mining operations was an unreasonable exercise of the police power. Compare *Reinman* v. *Little Rock*, 237 U. S. 171, 177, 180; *Pierce Oil Corporation* v. *City of Hope*, 248 U. S. 498, 500. Where the surface and the coal belong to the same person, self-interest would ordinarily prevent mining to such an extent as to cause a subsidence. It was, doubtless, for this reason that the legislature, estimating the degrees of danger, deemed statutory restriction unnecessary for the public safety under such conditions.

It is said that this is a case of a single dwelling house; that the restriction upon mining abolishes a valuable estate hitherto secured by a contract with the plaintiffs; and that the restriction upon mining cannot be justified as a protection of personal safety, since that could be provided for by notice. The propriety of deferring a good deal to tribunals on the spot has been repeatedly recognized. *Welch* v. *Swasey*, 214 U. S. 91, 106; *Laurel Hill Cemetery* v. *San Francisco*, 216 U. S. 358, 365; *Patsone* v. *Pennsylvania*, 232 U. S. 138, 144. May we say that notice would afford adequate protection of the public safety where the legislature and the highest court of the State, with greater knowledge of local conditions, have declared, in effect, that it would not? If public safety is imperiled, surely neither grant, nor contract, can prevail against the exercise of the police power. *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659; *Atlantic Coast Line R. R. Co.* v. *Goldsboro*, 232 U. S. 548; *Union Dry Goods Co.* v. *Georgia Public Service Corporation*, 248 U. S. 372; *St. Louis Poster Advertising Co.* v. *St. Louis*, 249 U. S. 269. The rule that the State's power to take appropriate measures to guard the safety of all who may be within its jurisdiction may not be bargained away was applied to compel carriers to establish grade crossings at their own expense, despite contracts to the contrary; *Chicago, Burlington & Quincy R. R. Co.* v. *Nebraska*, 170 U. S. 57;

and, likewise, to supersede, by an employers' liability act, the provision of a charter exempting a railroad from liability for death of employees, since the civil liability was deemed a matter of public concern, and not a mere private right. *Texas & New Orleans R. R. Co. v. Miller,* 221 U. S. 408. Compare *Boyd v. Alabama,* 94 U. S. 645; *Stone v. Mississippi,* 101 U. S. 814; *Butchers' Union Co. v. Crescent City Co.,* 111 U. S. 746; *Douglas v. Kentucky,* 168 U. S. 488; *Pennsylvania Hospital v. Philadelphia,* 245 U. S. 20, 23. Nor can existing contracts between private individuals preclude exercise of the police power. " One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson County Water Co. v. McCarter,* 209 U. S. 349, 357; *Knoxville Water Co. v. Knoxville,* 189 U. S. 434, 438; *Rast v. Van Deman & Lewis Co.,* 240 U. S. 342. The fact that this suit is brought by a private person is, of course, immaterial to protect the community through invoking the aid, as litigant, of interested private citizens is not a novelty in our law. That it may be done in Pennsylvania was decided by its Supreme Court in this case. And it is for a State to say how its public policy shall be enforced.

This case involves only mining which causes subsidence of a dwelling house. But the Kohler Act contains provisions in addition to that quoted above; and as to these, also, an opinion is expressed. These provisions deal with mining under cities to such an extent as to cause subsidence of—

(a) Any public building or any structure customarily used by the public as a place of resort, assemblage, or amusement, including, but not being limited to, churches, schools, hospitals, theatres, hotels, and railroad stations.

(b) Any street, road, bridge, or other public passageway, dedicated to public use or habitually used by the public.

(c) Any track, roadbed, right of way, pipe, conduit, wire, or other facility, used in the service of the public by any municipal corporation or public service company as defined by the Public Service Company Law.

A prohibition of mining which causes subsidence of such structures and facilities is obviously enacted for a public purpose; and it seems, likewise, clear that mere notice of intention to mine would not in this connection secure the public safety. Yet it is said that these provisions of the act cannot be sustained as an exercise of the police power where the right to mine such coal has been reserved. The conclusion seems to rest upon the assumption that in order to justify such exercise of the police power there must be "an average reciprocity of advantage" as between the owner of the property restricted and the rest of the community; and that here such reciprocity is absent. Reciprocity of advantage is an important consideration, and may even be an essential, where the State's power is exercised for the purpose of conferring benefits upon the property of a neighborhood, as in drainage projects, *Wurts* v. *Hoagland,* 114 U. S. 606; *Fallbrook Irrigation District* v. *Bradley,* 164 U. S. 112; or upon adjoining owners, as by party wall provisions, *Jackman* v. *Rosenbaum Co., ante,* 22. But where the police power is exercised, not to confer benefits upon property owners, but to protect the public from detriment and danger, there is, in my opinion, no room for considering reciprocity of advantage. There was no reciprocal advantage to the owner prohibited from using his oil tanks in 248 U. S. 498; his brickyard, in 239 U. S. 394; his livery stable, in 237 U. S. 171; his billiard hall, in 225 U. S. 623; his oleomargarine factory, in 127 U. S. 678; his brewery, in 123 U. S. 623; unless it be the advantage of living and doing business in a civilized community. That reciprocal advantage is given by the act to the coal operators.