DONOHOE CONSTRUCTION COMPANY, INC., Appellee,

v.

MONTGOMERY COUNTY COUNCIL and Montgomery County, Maryland, Appellants,

and

The Maryland-National Capital Park and Planning Commission, the Montgomery County Planning Board of the Maryland-National Capital Park and Planning Commission, Defendants.

DONOHOE CONSTRUCTION COMPANY, INC., Appellee,

v.

The MARYLAND–NATIONAL CAPITAL PARK AND PLANNING COMMISSION, the Montgomery County Planning Board of the Maryland-National Capital Park and Planning Commission, Appellants,

and

Montgomery County Council and Montgomery County, Maryland, Defendants.

Nos. 76–1850 and 76–1851.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 5, 1977.

Decided Dec. 20, 1977.

---

Charles S. Rand, Asst. County Atty., Rockville, Md. (Richard S. McKernon, County Atty., Robert G. Tobin, Jr., Deputy County Atty., Rockville, Md., on brief), for appellants in 76–1850.

Gus B. Bauman, Silver Springs, Md. (Barbara A. Sears, Sanford E. Wool and Durvasula S. Sastri, Silver Springs, Md., on brief), for appellants in 76–1851.

Roy Niedermayer, Washington, D.C. (Warren K. Kaplan, Washington, D.C., on brief), for appellee in 76–1850 and 76–1851.

Before HAYNSWORTH, Chief Judge, and WINTER and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

These appeals are from a decision of the district court holding that Montgomery County, Maryland (County) took the private property of Donohoe Construction Company, Inc. (Donohoe) without just compensation in violation of the fifth and fourteenth amendments to the Constitution, and entering judgment against County, Maryland-National Capital Park and Planning Commission, Montgomery County Planning Board of the Maryland-National Capital Park and Planning Commission and Montgomery County Council, all of which were defendants in the action instituted in the district court. The district court, finding that certain actions undertaken by defendants with regard to Donohoe's property constituted an implied or *de facto* taking, ordered County to pay Donohoe the sum of $461,042.14 in exchange for an unencumbered fee simple title to the property. Because we agree with defendants that the facts as found by the district court are not sufficient to support a finding that a taking occurred, we reverse and direct entry of judgment for them.

## I.

Since March 1973, Donohoe has been the record owner of a parcel of land, located in the Friendship Heights section of Montgomery County, Maryland. Prior to Donohoe's purchase of this property, the Montgomery County Council and the Maryland-National Capital Park and Planning Commission (Commission)[1] had approved and adopted a Master Plan for the Bethesda-Chevy Chase planning area of which the town of Friendship Heights is a part. In December 1972, before Donohoe's purchase was completed but during its negotiations for the property, the Montgomery County Planning Board (Board)[2] adopted a preliminary Sector Plan for the Central Business District of Friendship Heights as an amendment to the Bethesda-Chevy Chase Master Plan. The preliminary plan recommended that a portion of Friendship Heights, including the parcel subsequently purchased by Donohoe, be downzoned so as to limit commercial development.

At the time of Donohoe's purchase of the Friendship Heights property, the property consisted of two lots, upon which were located single-family residences, and an abandoned portion of a public roadway. Donohoe's intent was to demolish the existing structures and construct in their place a fourteen-story office building. Such a building was permitted by the zoning regulations then in effect but would not be permitted if the property was downzoned in accordance with the Board's preliminary recommendation. On March 19, 1973, Donohoe filed a building permit application with the appropriate county agency. As required by law, copies of the application were forwarded to the Commission, the County Public Works Department and the Washington Suburban Sanitary Commission (WSSC)[3] for review and comment. The

1. The Maryland-National Capital Park and Planning Commission is a state-created agency responsible for preparing and maintaining a master plan for the physical development of the Maryland-Washington Regional District, comprising parts of Montgomery and Prince George's Counties, Maryland. Its powers, duties and functions are set out in Md.Ann. Code of 1957, art. 66D.

2. The Montgomery County Planning Board comprises those members of the Maryland-National Capital Park and Planning Commission appointed by the Montgomery County Council. Its primary responsibility is planning for the Montgomery County portion of the Maryland-Washington Regional District.

3. The Washington Suburban Sanitary Commission is a public authority charged with managing and operating public sewage facilities in the

Commission promptly informed the County, which in turn informed Donohoe, that Donohoe's application could not be acted upon until it filed with the Commission a preliminary subdivision plan as required by the Montgomery County Code.[4] Donohoe complied with this requirement on April 13, 1973. In May 1973, WSSC advised both the Commission and Donohoe that WSSC would be unable to provide sewer service to Donohoe's proposed office building on account of the sewer moratorium then in effect in Friendship Heights.[5] On August 2, 1973, the Board, acting upon the Commission's recommendation, disapproved Donohoe's subdivision plan. Chief among the reasons given was the unavailability of adequate sewer service. With the disapproval of the subdivision plan, Donohoe was unable to pursue further the permit for construction of the planned office building.[6]

In October 1973, following public hearings, the Board adopted a Final Sector Plan for Friendship Heights. Included in this plan was a recommendation that Donohoe's property be acquired by the local taxing district for a community recreation center. In the alternative, the plan recommended that the property be downzoned as originally proposed. This plan, including the recommendation to acquire Donohoe's proper-

ty, was approved by the Montgomery County Council in May 1974. At the same time, $229,000 was budgeted in the County's Capital Improvements Program (CIP) for the purchase of Donohoe's property in fiscal year 1975.

In the meantime, in April 1974, Donohoe was informed that its building permit application was being rejected pending Council action on the zoning recommendations contained in the Final Sector Plan.[7] In July 1974, Donohoe's property was downzoned, thereby prohibiting construction of the building proposed by Donohoe.[8] Less than four months later, on November 4, 1974, Donohoe filed suit in the United States District Court, alleging that the above-recited actions on the part of the County Council, the Commission and the Board constituted a taking without just compensation in violation of the fifth and fourteenth amendments to the Constitution.[9] The district court, exercising jurisdiction pursuant to 28 U.S.C. § 1331, agreed with the plaintiff and ordered the relief sought.[10]

## II.

Before we reach the merits of this case, we must address two preliminary points raised by defendants, both of which go to

Washington Suburban Sanitary District of which Montgomery County is a part.

**4.** Section 50–20 of the Montgomery County Code provides that no building permit can issue unless the proposed "structure is to be located on a lot or parcel of land which is shown on a plat recorded in the plat books of the county . . . ." Since the building proposed in Donohoe's application cut across existing plat lines, the property had to be "resubdivided" before a permit could issue.

**5.** This controversial moratorium, which has been in effect since 1972, is described in detail in *Smoke Rise, Inc. v. Washington Suburban Sanitary Commission*, 400 F.S. 1369 (D.Md. 1975). The district court in *Smoke Rise* found the moratorium to be a valid exercise of the state's police power.

**6.** Donohoe challenged this action by the Commission and the Board in a Maryland equity court. The Chancellor subsequently upheld the Board's action in *One Park North Associates v. Maryland-National Capital Park and Planning Commission*, Equity No. 48320 (Circuit Court

for Montgomery County 1976). Apparently, no appeal was taken.

**7.** This action was taken under authority granted in County Ordinance 7–56, enacted in December 1973.

**8.** Donohoe subsequently challenged the zoning amendment in the Circuit Court for Montgomery County, Maryland. The record is silent as to the current status of this suit.

**9.** The posture of the parties has not changed in the more than three years since the filing of this action. While funds for acquisition are still budgeted in County's CIP, County has taken no action to acquire the property. At oral argument, County attorneys cited "political reasons" for this delay.

**10.** The district court awarded plaintiff a fair market value of $378,888.00 and an additional $82,154.14 to compensate for the expense of holding the property since the date of taking.

the jurisdiction of the district court to hear this case.

■ First, defendants contend that the district court lacked federal question jurisdiction under 28 U.S.C. § 1331. Their argument is that, since the facts alleged in appellee's complaint fall short of constituting a taking within the meaning of the fifth and fourteenth amendments, there is no federal question on which to ground jurisdiction. This argument was answered thirty years ago in *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). There the court held that, where a complainant raises allegations which may or may not state federal claim, a district court should take jurisdiction to decide the merits of the controversy so long as the questions raised are not frivolous on their face. Here, Donohoe's complaint raises a substantial question as to the limitations placed on the state condemnation and zoning powers by the fourteenth amendment. Consequently, under the doctrine of *Bell v. Hood*, the district court acted properly in assuming jurisdiction under 28 U.S.C. § 1331.[11]

■ Second, defendants contend that, even if 28 U.S.C. § 1331 authorizes federal jurisdiction, the doctrine of *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), requires that the district court abstain from exercising that jurisdiction. Fatal to defendants' argument, however, is the fact that there exist in the present case no potentially dispositive questions of state law. *See* 312 U.S. at 498–500, 61 S.Ct. 643. None

of the parties has suggested that any interpretation of those Maryland statutes which purportedly authorized the actions of the County or the Commission would be dispositive of the litigation, nor was the district court asked to find a taking within the meaning of the Maryland state constitution. The only issue raised was one of federal due process. It is obvious that, where no issue of state law exists, the federal constitutional issue cannot be avoided by "a definitive ruling on the state issue . . . ." 312 U.S. at 498, 61 S.Ct. at 644. Hence, the *Pullman* doctrine is inapposite,[12] and the district court's decision not to abstain was clearly the correct one. *See Ballard Fish & Oyster Co. v. Glaser Construction Co.*, 424 F.2d 473 (4 Cir. 1970).

### III.

■ On the merits of the present controversy, the district court found that:

When the facts of this case are scrutinized, it becomes apparent that only a finding of *de facto* taking can preserve the guarantes of the Fifth and Fourteenth Amendments. When all the actions of the defendants are viewed together, it is apparent that Donohoe has been denied any reasonable economic use of its property at the expense of a public benefit, the proposed acquisition of the land for a community/recreation center.

In so finding, the district court was particularly troubled by five separate actions on the part of the defendants:

1. The August 1973 denial of Donohoe's subdivision plan.

---

11. The Supreme Court recently reaffirmed the doctrine of *Bell v. Hood* in *Hagans v. Lavine*, 415 U.S. 528, 542, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

12. This is not a case like *Askew v. Hargrave*, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971), where the complainant, in challenging a new state law involving the financing of public education, asserted a federal equal protection claim in federal court and asserted his state claims in state court. The Supreme Court, looking with disfavor at this sort of bifurcation, ordered the district court to abstain. In the instant case, Donohoe's state court actions challenge as unauthorized two of the defendant's decisions. Other than arising out of the

same factual nucleus, these actions are entirely distinct from the one at bar. Likewise, we find *Alabama Public Service Commission v. Southern Railway Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), and *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), to be distinguishable from the instant case. There, the plaintiffs were raising federal due process challenges to very complex state regulatory schemes before such schemes had received any definitive interpretation from the state courts. Here, there is no such challenge. Rather than a broadside attack on an entire statutory scheme, this suit alleges merely an isolated abuse of state power.

2. The October 1973 amendment to the Master Plan wherein it was recommended that Donohoe's parcel be either acquired or downzoned.

3. The April 1974 rejection of Donohoe's building permit application.

4. The May 1974 decision to acquire Donohoe's property at a future time together with the budgeting of the necessary funds.

5. The July 1974 zoning amendment downzoning Donohoe's property.

The district court was not prepared to say that any one of the above actions in itself constituted a taking. Indeed, it was of the opinion that, viewed singly, most did not constitute a taking. Nonetheless, the district court concluded that the cumulation of these actions was sufficiently abusive of Donohoe's property rights to constitute a *de facto* taking.[13] We disagree.

In our view, the district court erred in not giving controlling weight to the effect of the sewer moratorium on Donohoe's use of the Friendship Heights property. The essence of Donohoe's dispute with the County and the Commission is that they impermissibly interfered with its plans to proceed with construction of a fourteen-story building on the property. Specifically, Donohoe complains that the denial of the subdivision plan, the rejection of the building permit application and the amendment downzoning the property each contributed to the frustration of the proposed use of the property. In reality, however, none of these actions visited any perceptible harm upon Donohoe; for the fundamental impediment to Donohoe's construction plans was (and still is) the sewer moratorium imposed upon the Friendship Heights area by the State of Maryland. This impediment was clearly beyond the control of any of the parties to this litigation.[14] The moratorium has already survived constitutional challenge, *Smoke Rise, Inc. v. Washington Suburban Sanitary Commission, supra,* and we see no reason to reopen that issue in the context of the instant case. We, therefore, conclude that in making its determination that an unconstitutional taking occurred, the district court erred in giving weight to those actions by defendants adverse to Donohoe's interest in constructing an office building on the property and in failing to recognize the significance and impact of the state-imposed sewer moratorium.

Once the impact of the sewer moratorium has been taken into account, it becomes clear that, to prevail on the taking issue, Donohoe must look exclusively to the actions of the defendants going to the public acquisition of the property.[15] So viewed, the question for decision is this: has the County, through either action or inaction, so abused its condemnation powers as to constitute an implied or *de facto* taking in violation of the fifth and fourteenth amendments?

---

**13.** While a taking normally occurs as a result of formal condemnation proceedings instituted by the acquiring governmental unit, it is well established that an unconstitutional taking can also be implied from a substantial and burdensome interference by the government with a private property owner's use of his property. *Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Ballard Fish & Oyster Co. v. Glaser Construction Co., supra.* Whether a particular interference transgresses the limitation imposed by the fifth and fourteenth amendments is a question to be resolved on the facts of each particular case. *Pennsylvania Coal Co. v. Mahon, supra,* 260 U.S. at 413, 43 S.Ct. 158. However, for governmental interference with private property rights to constitute an implied or *de facto* taking, such interference must be so substantial as to "deprive the owner of all or most of his interest" in the property. *United States v. General Motors,* 323 U.S. 373, 378 [65 S.Ct. 357, 360, 89 L.Ed. 311] (1945).

**14.** *See Board of Appeals of Montgomery County v. Marina Apts., Inc.,* 326 A.2d 734 (Md. 1974), in which the Maryland Court of Appeals held that responsibility for determining sewer availability lay exclusively with WSSC.

**15.** While, in its opinion, the district court viewed appellants' actions as a totality, it is fair to conclude that it viewed those actions going to the acquisition of Donohoe's property as the most disturbing. In fact, by fixing the date of the taking at May 28, 1974, the date at which the decision was made to acquire the Donohoe property, the court at least implicitly suggested that this was the act that pushed the County beyond the limits imposed by due process.

In urging us to affirm the decision of the district court, Donohoe places particular reliance on three cases which it claims are closely analogous to the one at bar: *Benenson v. United States*, 548 F.2d 939 (Ct.Cl. 1977); *Drakes Bay Land Co. v. United States*, 424 F.2d 574, 191 Ct.Cl. 389 (1970); *Foster v. City of Detroit*, 254 F.Supp. 655 (E.D.Mich.1966), *aff'd*, 405 F.2d 138 (6 Cir. 1968). In each, it was concluded that an abuse of condemnation powers had occurred and in each the acquiring government was ordered to compensate the property owner forthwith. Each, however, is clearly distinguishable from the instant case in that in each there was exhibited a pattern of governmental abuse wholly absent here. In each, the "cloud of condemnation" had been hanging over the property for years. Because of this "cloud", no private market for the property existed. Development was impossible either because no bank would take a mortgage or because the governmental unit itself prohibited development pending acquisition. Yet the government refused to proceed with the condemnation. The property owner, holding a nonliquid, non-productive asset with no immediate prospects of compensation, finally sought federal judicial intervention to force the governmental unit to acquire the property.

■ The principle which emerges from these cases is that federal courts will not intervene in local condemnation proceedings absent strong and convincing evidence that the government has egregiously abused its condemnation powers. Against this standard, the facts of the instant case are not sufficiently compelling to warrant federal judicial intervention. Even if the County's decisions of May 1974, to acquire Donohoe's property and to budget funds therefor, rendered the property commercially useless to Donohoe, it cannot be said as a matter of law that the County's condemnation powers had been abused. Central to the cases cited to us by Donohoe is the notion that the acquiring governmental unit acted in an unreasonably dilatory manner.[16] Certainly at the commencement of this suit just six months after the decision to acquire was made, it cannot be said that the County had been unreasonably dilatory in instituting condemnation proceedings. To conclude otherwise would, in our opinion, unreasonably burden the legitimate planning efforts of state and local governments.[17]

This is not to say that defendants have acted in an exemplary manner throughout. While the County may not have been expected to acquire Donohoe's property by the time suit was filed, it has made no attempt during the three-year pendency of this suit either to institute condemnation proceedings or to remove the "cloud of condemnation." [18] Of course, defendants may have

---

16. In *Benenson*, the "cloud of condemnation" hung over the property owners' heads for some ten years before suit was commenced; in *Foster*, twelve years.

17. Our reticence to intervene in what are important local functions is entirely consistent with emerging principles of federalism evident in such recent Supreme Court decisions as *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); and *San Antonio Ind. School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). It is also consistent with the traditional reluctance of the court to find that an exercise of local police or taxing power constitutes a taking within the meaning of the fifth and fourteenth amendments. *See, e. g., Pittsburgh v. ALCO Parking Corp.*, 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974); *Goldblatt v. Hempstead, supra; Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

18. Defendants strenuously argue that federal relief is inappropriate in this case despite any acquisition delay because Donohoe had available an adequate state-law remedy in the "tax-free reservation" statute, Montgomery County Code of 1972, § 50–31. This statute authorizes the County to reserve land for public use (and thereby forestall private development) pending public acquisition for up to three years. During this three-year reservation period, the owner of record is immune from all local property taxation. The reservation and resultant immunity are apparently triggered by the developer's filing a preliminary subdivision plan in accordance with § 50–20 of the Code. *See* footnote 4, *supra*. It is not clear from the record why Donohoe has not received the relief envisioned by § 50–31. We can speculate that the inactive status of Donohoe's subdivision plan at the time of the acquisition decision may account for this failure. Perhaps if Donohoe had filed a new subdivision plan subsequent to the deci-

taken this firm stance against negotiating with Donohoe in order to preserve a final determination on the merits, such final determination being viewed as essential to future land use planning by the County and the Commission. But now that there has been a resolution on the merits, the County should move with dispatch either to institute formal condemnation proceedings or to rescind the decision to acquire the subject property, thereby leaving Donohoe free either to sell the property or to develop it within the limits imposed by the applicable zoning regulations and the sewer moratorium.

The judgment of the district court is reversed and the cause remanded with instructions to enter judgment for the defendants.

*REVERSED AND REMANDED.*

sion to acquire, the relief might have been forthcoming. On the other hand, it would seem inequitable to require this to be done when the actual development of the property was forestalled by the sewer moratorium. The question of the availability of the tax exemption is a question more appropriately pursued in the state courts, and we express no view on it. Because we decide today in the defendants' favor, it is also unnecessary for us to determine, assuming that as a matter of state law the remedy provided by § 50–31 was available to Donohoe, whether, as a matter of federal law, such remedy was adequate to mitigate the deleterious effects of the County's decision to acquire Donohoe's property.