The Cleveland Builders Supply Co., Appellee, *v.* City of Garfield Heights, Appellant.

(No. 23548—Decided August 1, 1956.)

*Mr. M. B. Johnson* and *Mr. H. H. Johnson,* for appellee.
*Mr. Arthur T. Wincek,* for appellant.

Skeel, J.   This appeal comes to this court on questions of law and fact from a decree and judgment for the plaintiff entered upon trial of the issues by the Common Pleas Court of Cuyahoga County.   The plaintiff's action seeks a declaratory judgment, injunction and equitable relief against the restricted use of its property provided for by the zoning ordinances of the city of Garfield Heights.

The plaintiff, or a wholly-owned subsidiary, has been the owner of an 81-acre tract of land, which is U shaped, with its

westerly line of about 3,000 feet running southeasterly along the curved line of The New York Central Railroad right of way, thence easterly over 1,000 feet to its easterly line which line proceeds northerly about 3,200 feet. The easterly segment of the U is about 535 feet wide, and within its dimensions is a 25.5-acre tract from which the plaintiff desired to mine about 1,230,-000 cubic yards of shale to be used in making brick at its nearby brick plant. This property is very rugged and uneven with three or four deep gullies running through it, with precipitous banks varying in depth between 20 and 60 feet, and is within the southwesterly part of the city of Garfield Heights. The land in this part of Garfield Heights is in part on or near the bank sloping down to the valley of the Cuyahoga River, is filled with gullies with sharp or steep embankments, and for the most part is very uneven and rugged.

Between the east and west legs of plaintiff's property, and located on high ground, is what is known as the Rockcliff Subdivision through which East 96th Street runs from Granger Road in a southerly direction almost to plaintiff's property and almost to the top of the slope to the Cuyahoga River Valley above described. Between this subdivision and the west line of the the easterly part of plaintiff's property is an undeveloped 20-acre parcel. There is also an undeveloped 20-acre parcel directly to the east of the east line of plaintiff's property, and a 17-acre parcel of vacant land is located to the north. The Rockcliff Subdivision was laid out in 1924 with 241 lots. There have been about 55 houses built during the intervening 32 years, most of them being on East 96th Street or on side streets to the west of East 96th Street and away from the easterly segment of plaintiff's land. The nearest housing development to the east is about a quarter of a mile away and is separated from plaintiff's property by very deep and precipitous gullies or ravines. The property abutting the southerly line of plaintiff's U-shaped property joins it at about the level of the railroad right of way and slopes down to the lowlands of the Cuyahoga River Valley. It is zoned for industrial use which includes the right to mine shale or other minerals.

The basic material used in the manufacture of tile or brick is clay or shale. The plaintiff purchased the U-shaped 81-acre

tract in 1919, wherein nature has deposited a large quantity of high grade shale of exceptional quality. After this property was acquired in 1919, shale was removed therefrom to be used for the manufacture of brick at the plaintiff's nearby Valleyview plant until 1932. The record shows that during this period over 330,000 cubic yards of shale were excavated and used.

The use of the nearby Valleyview Brick Plant was discontinued at the beginning of the economic depression in the early 1930's when the demand for brick had been greatly reduced. The plant was then considered as obsolete and its use discontinued with the intention of rebuilding it when demand for brick required it. The plaintiff's other brick plants were so far distant that further use of its shale deposit in the 81 acres was temporarily discontinued until a new plant was built nearby. Because of the depression and World War II which caused governmental restrictions of vital building materials, the new plant was not constructed until 1951 after restrictions were removed. A study of the best place to build a brick plant in this vicinity to take the place of the obsolete Valleyview plant was carried on and the location determined. This plant was built on Warner Road, a location within the immediate vicinity, and located there with the intended purpose of continuing the use of shale from the 81-acre tract, which use had been interrupted as above set forth. One hundred thousand dollars was expended in the building of this plant.

After the completion of the plant, the plaintiff discovered that in 1942 the city of Garfield Heights had passed a zoning ordinance as an emergency measure by which the plaintiff's 81 acres, which it had acquired in 1919 to provide shale and clay necessary for its brick manufacturing business, had been zoned as and for single residence purposes. While the following conclusion, reached from the evidence, is not of great legal significance because once a city council has enacted an ordinance, its act is presumed to have been the conclusion reached by it after careful and deliberate consideration of all important applicable facts, yet the manner in which the several zoning classifications decided upon in the zoning ordinance according to testimony of the witnesses who prepared the zoning map was to zone all existing uses as then employed and all remaining vacant land

for Class I residence purposes without regard for the situation or usability of the land for such purpose, with the exception of land then used for farming.

The property of the plaintiff, as shown by the evidence, cannot be economically allotted for residence purposes. Its sharp grades and precipitous surface make the cost of providing utility services prohibitive as compared with like costs upon reasonably level ground, while the usability of this land for residence purposes is such as to bring no financial return to its owner if allotted for that purpose. The value of the shale deposit in the property for commercial purposes is over $325,000.

The plaintiff is not a newcomer in this neighborhood. In fact, its ownership of the property in question antedated the zoning ordinance almost 25 years. Its use of the property for commercial purposes had not been abandoned but only temporarily suspended by circumstances far beyond its control. This is not the case where business is attempting to spread into a developed residential area but rather an attempt by the exercise of the police power to extend a residential district into and to include therein property in use for commercial purposes. In the case of *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S., 365, 71 L. Ed., 303, 47 S. Ct., 114, the court said, at page 390, that the purpose of zoning "is to divert an industrial flow from the course which it would follow, to the injury of the residential public if left alone, to another course where such injury will be obviated." The converse must also be true. The forced restriction of commercially used property at a sacrifice of over 90 per cent of its value to residence purposes can find no justification under the exercise of the police power of the city in the absence of some substantial benefit to the community or its residents.

The Rockcliff Subdivision did not come into being until 1926, or seven years after plaintiff purchased its 81-acre tract, and some of the houses were built while the shale-digging operation on plaintiff's land was in full swing and long before the zoning ordinance of 1942. While it is true that a legislative authority can, in the interest of the public health, morals, safety and the general good and welfare of the people, regulate the use of property under the exercise of the police power, it is equally

true that in the exercise of such power it cannot prohibit an existing use.

The claim of the defendant that the plaintiff had abandoned its use of the land as a source of mining basic materials for manufacturing brick is not supported by the evidence. The zoning ordinance defines what constitutes "abandonment" by section 8 as follows:

"A nonconforming use shall be considered abandoned when the *intent of the owner to discontinue the use is apparent,* or when it has been replaced by a conforming use, or when the characteristic equipment and furnishings of the nonconforming use have been removed from the premises and have not been replaced by similar equipment within two years. Whenever the nonconforming use of a building or premises has been changed to a more restricted use, the use of said buildings or premises may not thereafter be changed back to the previous nonconforming use."

There is not a syllable of evidence in the record that the plaintiff ever intended to abandon its mining of shale from the land in question. The evidence is definitely to the contrary. Nor is there any evidence that equipment or furnishings characteristic of this kind of operation have ever been on the parcel here in question or that any such property has ever been removed therefrom or from any other part of the 81-acre tract. The words "characteristic equipment and furnishings" cannot be held to restrict continued nonconforming use of property held for mining purposes where there is no evidence tending to establish that mining equipment of any kind was ever on the property or used in connection with it. Here the ordinance was not passed until 10 years after the removal of shale had been temporarily suspended. The only evidence that even remotely deals with the manner of removing shale deals with the future. This evidence is that when the operation is again resumed, the latest electrical planing device will be used and the surface of the shale watered down to prevent dust. Under the provisions of section 8 of the defendant's zoning ordinance, no abandonment has been shown. The city council having defined the meaning of abandonment, any case law defining the term differently cannot be considered. We hold that the plaintiff did not abandon

its purpose to use this property for the mining of shale. We find that the operation of mining shale has been a continuing nonconforming use with respect to the plaintiff's property and in that respect its conduct of such business is not in violation of the ordinance under its nonconforming use provisions.

We come now to the final question dealing with the constitutionality of the ordinances here in question as they affect plaintiff's property. In the first place the attempt of the defendant to present the population trend as a factual consideration upon this issue is totally without merit. It is conceivable that necessity might compel the application of unusual measures to prepare the plaintiff's property for residential use, but there is not a word of evidence to support such need. The plaintiff's 25 acres equals about six-tenths of one per cent of the city's area which is far from fully developed.

The principal question to be considered on the constitutional issue is the usability of the plaintiff's property for the purposes required by the zoning ordinances and the destruction of the greater part of the value of the property if such use is enforced.

We have already set forth our conclusion that it will be almost impossible to devote the greater part of the 25-acre parcel to residence use. We will, therefore, now consider the question of whether the ordinances so completely destroy the value of the property as to constitute a taking of property in violation of plaintiff's constitutional rights. In considering this question, it must be remembered that the economic value of the property is in the minerals deposited within or under the surface of its territorial limits. This is not a case where a business which is prohibited in one place can be carried on in another place. Here either the plaintiff must be afforded the right to mine shale or the value of its property for this purpose will be forever lost.

It is not economically sound for the community to lock from use valuable minerals deposited by nature under the surface of the land to the almost total destruction of its value without any benefit to the people or damage to surrounding territory and where the health, morals, safety and the general welfare or common good of the people are in fact not thereby affected.

In the case of *Washington, ex rel. Seattle Title Trust Co.,* v.

*Roberge, Supt.*, 278 U. S., 116, 73 L. Ed., 210, 49 S. Ct., 50, in the L. Ed. headnotes it is said:

"2. Legislatures may not, under the guise of the police power, impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities.

"3. The right to devote real estate to any legitimate use is property within the protection of the Constitution."

See, also, *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S., 393, 67 L. Ed., 322, 43 S. Ct., 158; *Village of Terrace Park* v. *Errett*, 12 F. (2d), 240; *City of North Muskegon* v. *Miller*, 249 Mich., 52, 227 N. W., 743; *Pere Marquette Ry. Co.* v. *Muskegon Township Bd.*, 298 Mich., 31, 298 N. W., 393; *Midland Electric Coal Corp.* v. *County of Knox*, 1 Ill. (2d), 200, 115 N. E. (2d), 275; *Cordts* v. *Hutton Co.*, 146 Misc., 10, 262 N. Y. Supp., 539, affirmed 266 N. Y., 399, 195 N. E., 124.

In 168 A. L. R., 1181 (*Town of Burlington* v. *Dunn*, 318 Mass., 216, 61 N. E. [2d], 243), referring particularly to the annotation beginning on page 1188 and to subtitle IV, "Zoning," it is said, at page 1198:

"With respect to zoning ordinances and regulations, it has been repeatedly observed that there is a substantial difference between an enactment or ruling prohibiting a manufacturing or commercial business in a residential district which may be conducted in another locality with equal profit and advantage, and one which has the effect of wholly depriving the owner of land of the natural products thereof and of the right to remove or work them. In view of modern trends in the law of zoning, this distinction becomes one of degree of hardship, for it may be assumed that some hardship, actual even if not recognizable in law, results to one who is prevented from utilizing his land in this regard. However, the broad rules of reasonableness commonly applied to zoning have been invoked here, with quite similar results, although, as the cases show, great weight has been attached to the nature of the proposed operation, and the attendant danger and damage."

In the case of *City of Pittsfield* v. *Oleksak* (1943), 313 Mass., 553, 47 N. E. (2d), 930, which concerned the removal of timber in violation of a zoning ordinance, it was shown by the evidence, as

to more than half the timber, that further delay in its removal would cause damage to its value. The first paragraph of the N. E. headnotes provides:

"1. Determination of whether zoning ordinance restricting particular use to which landowner desires to put his land is reasonable and permissible interference in exercise of police power for public benefit or is a forbidden, arbitrary, unreasonable and oppressive deprivation of private property without compensation is generally dependent upon peculiar circumstances and whether particular interference can reasonably be sought to have some tendency to advance interests of public."

And on page 555 of the Massachusetts Report the court says:

"Whether the impact of a zoning ordinance upon the particular use which a landowner desires to make of his land is a reasonable and permissible interference with his rights as owner in the exercise of the police power for the public benefit or is an arbitrary, unreasonable, and oppressive, and therefore forbidden, deprivation of private property without compensation often depends upon the peculiar circumstances of the particular instance. *Euclid* v. *Ambler Realty Co.,* 272 U. S., 365, 387, 395. It may be said that in such cases law and fact march together. The correct decision is to be found in the answer to the question whether the particular interference that causes injury to the individual can reasonably be thought to have some tendency to advance the interests of the public, either in the direct consequences, or indirectly by upholding the integrity of a system that as a whole may reasonably be thought to promote the interests of the public. *Lexington* v. *Govenar,* 295 Mass., 31, 36; *Wilbur* v. *Newton,* 302 Mass., 38, 39, 41. And of course all presumptions are to be indulged in favor of the validity of the ordinance in its application to all instances falling within its terms.

"In the present instance, on the facts found, the application of the ordinance to stop the defendant's activities would permanently deprive the defendant, and therefore the community, of a valuable and otherwise wasting asset without accomplishing in the slightest degree, directly or indirectly, any of the purposes for which zoning is authorized. The segregation of eight square miles of Berkshire country side, principally

woodland, containing in all only twenty-five or thirty houses, as a 'Residence "A"' district, with minute restrictions adapted to an urban area, seems in itself an extreme exercise of the zoning power conferred upon municipalities by G. L. (Ter. Ed.) c. 40, paragraph 25, as amended, for the purposes there set forth, and subject to the provision there contained, that 'due regard' be paid to the 'characteristics' of the different parts of the city or town."

The great weight of authority supports the rule of reason in dealing with the conflict of the use of real property between the use dictated by a zoning ordinance enacted under the police power of the state to protect the public morals, health, safety and general welfare of the people and the constitutional right of an owner to enjoy the full value of his property where such value is based on recovering valuable natural resources found deposited thereon or therein. The mining of minerals is an activity of great importance to the people generally. Such enterprises are the very foundation of our prosperity. A city council cannot avoid giving due consideration in the protection of such valuable and necessary property rights when classifying property in a zoning ordinance. Here the evidence shows that the ordinance, if enforced against plaintiff's property, will destroy 93 per cent of its value, amounting to about $300,000. The location of the property, contiguous to and abutting along a railroad and other property zoned for commercial use, and its topography make any possible use of the property in the classification as zoned exceedingly doubtful, and the fact that the surrounding property will not be subjected to any greater hazards than heretofore and the public morals, health, safety and general welfare are not directly or indirectly affected can lead to but one conclusion and this is that as to the plaintiff's property the zoning ordinances in question are unconstitutional and void as a taking of plaintiff's property without due process.

This conclusion is also supported by the self-imposed restrictions in the manner in which the plaintiff will protect the public in its shale-mining operation on the 25.5-acre tract. In the journal entry in the Common Pleas Court, the plaintiff by consent provided that in the use of the property for mining shale it would provide sufficient lateral support to the side walls of

the pit created by the mining of the shale by leaving a margin of 40 feet between plaintiff's property line and its mining operation and by erecting a substantial fence completely around the high ground of the 25.5-acre parcel, so that all danger from the pit created by mining shale will be eliminated, and further provided against stagnant water pools and agreed to use modern equipment to prevent dust and noise.

For the foregoing reasons a decree may be entered as in Common Pleas Court.

*Judgment accordingly.*

KOVACHY, P. J., and HURD, J., concur.