CHARLES R. PARTLOW ET AL *v.*
LOUISE KEASLER ET AL

5-5524                              464 S. W. 2d 589

Opinion delivered March 22, 1971

*Penix & Penix* and *Hartman Hotz,* for appellants.

*Kirsch, Cathey, Brown* & *Goodwin* and *John C. Gregg,* for appellees.

GEORGE ROSE SMITH, Justice. This suit for a declaratory judgment is essentially a test case to determine whether a majority of the owners of what is actually a private water main can sell it to the city of Center Hill, over the protest of a substantial minority of the owners. This appeal is from a declaratory judgment denying the majority's asserted power to sell the water main. We have no hesitancy in sustaining the circuit court's judgment.

In 1958 the owners of about 40 tracts of land lying along Highway 25, immediately west of the city of Paragould, signed a "Water Line Agreement" for the purpose of obtaining city water for themselves. They elected to call their project "Water Improvement District No. 25 West," but it is conceded that the organization is not an improvement district under the laws of Arkansas. To the contrary, the association is essentially a group of neighboring landowners who banded together to install a private water line for their own use.

The terms of the 1958 Water Line Agreement are of controlling importance. The landowners named five of their number to serve as the board of directors of what we will call the district. Each of the original signatory landowners contributed $500 for his principal dwelling house and $250 for each appurtenant tenant house or rental unit. The board of directors were given the authority to permit other landowners to tie onto the water line by paying the same fees. The landowners agreed that any sale of their property would carry the water rights and that the purchaser would be bound by the water line agreement.

Under the agreement the directors were required

to use the district's funds to install a private water line for a distance of 18,000 feet along the highway. The district would also install individual laterals to the north or south edge of the highway right-of-way, from which point all expense would be borne by the landowner. It was never intended that the district would actually supply any water. The water is furnished by Paragould Water Improvement District No. 3, apparently a true improvement district. Each landowner has his own water meter and is billed directly by the Paragould improvement district for his consumption of water.

The Water Line Agreement contains no provision for its amendment by the patrons of the water line. Nor does it contain any provision authorizing the board of directors or the members themselves to sell the assets of the district. In fact, the only clauses looking specifically to the future are the one permitting other landowners to join the venture and a sentence providing that vacancies on the board of directors will be filled by majority vote of the landowners.

The venture proved to be decidedly successful. By 1969 a total of 311 patrons were being served by the district's water line. Assets of the district included the water mains, a large storage tank, pumps, real estate, and more than $12,000 in cash.

After the district was formed in 1958, the city of Center Hill, astride the water line, was incorporated and had grown to a population of 1201 by 1970. The district's water line is used, pursuant to the original Water Line Agreement, by some residents of the city; it is also used by landowners living outside the city. In 1969 the city sought to create its own water distribution system. Application was made to a federal agency for a loan of $620,000, payable over a period of 40 years, to finance the project. The federal lending agency required as a condition to the loan that the city own its water mains, which meant that it would have to acquire the district's line. To that end the city offered to purchase all the assets of the district upon substantially the following terms:

The district would transfer practically all its assets, including at least $12,000 in cash, to the city, in return for $75,000 in second mortgage bonds to be issued by the city. Those bonds would bear no interest, would be subordinate to the federal agency's first mortgage for $620,000, and would be payable only from the city's water revenues. The city's proposal was submitted to the district's 311 landowners, of whom 185 voted for the sale to the city and 48 voted against it. The other 78 did not vote, but it had been explained that a failure to vote would be counted as a vote against the sale. Thus slightly less than 60% of the patrons of the district voted for the sale.

We do not stop to explore nice questions of whether the district constitutes an unincorporated association, a joint venture, a partnership, a private trust, or some other recognized legal entity. It is enough to point out that the district is not a public utility. It is simply a band of landowners who together own a private water line. Each landowner has made an investment in the district and is a proportionate owner of its assets. The Water Line Agreement contains no provision conferring upon a majority of the members the power to sell the district's assets. We liken the proposed sale to a situation in which a majority of a group of tenants in common might claim the right to sell the entire property at a price of their own choosing and in disregard of the protests of the minority members of the group.

Here the minority landowners in the district own a share in a venture that is fully paid for and that is successfully serving its intended purpose of providing the landowners with city water. If the city's offer should be enforced, those landowners would be compelled to exchange their valuable property rights for non-interest-bearing second mortgage bonds, seemingly due at least 40 years in the future and subject to being wiped out by a foreclosure of the first mortgage. Moreover, the protesting landowners would themselves have to participate in paying the water revenues which are the sole security for the bonds, so that they would in ef-

fect be required to take part in buying their own property from themselves. We think it plain that the city's proposal violates the constitutional prohibition against the taking of private property for public use without just compensation. Ark. Const., Art. 2, § 22 (1874). In the familiar words of Justice Holmes, speaking for the court: "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 (1922).

Affirmed.