58

Hunter v. Richter

*Morris Gerber*, for plaintiffs.

*David Groshens* and *Maxwell Strawbridge*, for defendants.

DANNEHOWER, J., May 3, 1955.—Plaintiffs, property owners in Hatfield Township, Montgomery County, have filed this action in equity seeking a

preliminary injunction and, after hearing, a permanent injunction, enjoining and restraining defendants from operating and using their property as a trailer park or camp on the grounds that such use is in violation of the Hatfield Township Zoning Ordinance of 1951, which prohibits trailer camps of any nature and that such use is not in conformity with R-100 residential district zoning requirements.

In their answer, defendants allege that their trailer camp constitutes a nonconforming use as of the effective date of the zoning ordinance, that because of the expenditure of large sums of money they have a vested right to use and complete their trailer park and that both the ordinance prohibiting trailer camps and the application of residential requirements to trailers are unreasonable and discriminatory and, therefore, unconstitutional.

After a preliminary hearing, a preliminary injunction was granted restricting the number of trailers in the park to 22 (the number then parked) "so as to preserve the status quo until final hearing". Later a final hearing was held.

*The Issues Raised Are as Follow:*

I. Where defendants did not lease a parking lot to the first trailer until 11 months after the effective date of a township zoning ordinance (which prohibits trailer camps and all forms of business in R-100 residential districts and provides for only single-family dwellings with a minimum frontage of 100 feet and lot area of 15,000 square feet) does the construction of a road, two lakes, a utility house, an electric line, laying of water and sewer pipe, septic tanks, etc., constitute a nonconforming use in existence prior to the effective date of the zoning ordinance?

II. Did defendants acquire a vested right to develop and complete a large trailer camp with a capacity of

150 trailers at a cost of $150,000 in violation of a township zoning ordinance by expending certain sums of money over a period of two or three years prior to the effective date of the zoning ordinance?

III. May a township, in the exercise of its police power, prohibit any but temporary use of trailers for living purposes within its borders without violating the Constitution?

IV. Does a provision in a zoning ordinance requiring a minimum lot area of 15,000 square feet and a minimum frontage of 100 feet in a residential district apply to house trailers brought into a trailer camp after the effective date of said ordinance?

After a careful review of the testimony taken at the hearings, the many exhibits in the evidence, and briefs filed by both parties, the chancellor makes the following

*Findings of Fact*

1.

Plaintiffs are residents and taxpayers of Hatfield Township, and are owners in fee of properties located on Hatfield Valley Road (also known as Cowpath Road).

2.

Defendants are the owners in fee of a tract of ground, containing approximately 52 acres, on Hatfield Valley Road in Hatfield Township, which they purchased in 1939.

3.

Plaintiffs' premises, those properties which are contiguous to defendants' property, and all the premises on both sides of Hatfield Valley Road on which defendants' property fronts, are wholly occupied by single homes between Orvilla Road and Moyer Road (except for a church property located near the intersection of Hatfield Valley Road and Orvilla Road).

**4.**

The properties owned by plaintiff Hunter and plaintiff's witnesses Melvin W. Keyser et ux. were sold out of defendants' tract. The properties of the plaintiffs front on Hatfield Valley Road.

**5.**

When defendants sold a lot to plaintiffs, Hunters, in 1948, they represented that the balance of the tract would be used for building lots for single homes, and imposed building restrictions on lots carved out of. their tract in deeds to the Hunters, Keysers, Alexander Shucks and Gandys (later acquired by the Keysers) to the effect that only one single house should be erected on any 100-foot wide lot, to cost not less than $5,000, having a cellar, not a flat roof, and not erected nearer the property line than 50 feet.

**6.**

The premises of both plaintiffs and defendants are designated on the zoning map, which is attached to and made a part of the Zoning Ordinance of Hatfield Township, as being within an R-100 residential district.

**7.**

The Zoning Ordinance of Hatfield Township became effective on June 13, 1951.

**8.**

Article V, secs. 501 to 504, of the Zoning Ordinance of Hatfield Township (hereinafter referred to as the zoning ordinance) establishes R-100 residential districts and sets forth the regulations applicable thereto. Under its terms, land in such districts may only be used for single-family dwellings, municipal buildings and a telephone central office. All forms of business are prohibited. Each lot in an R-100 residential district must have a minimum frontage of 100 feet and a minimum area of 15,000 square feet.

9.

Article X, sec. 1006, of the said zoning ordinance prohibits trailer camps in any district, and further provides that a trailer may not be used as a place of residence in any district for a longer period than 14 days in any 12 consecutive months.

10

On May 10, 1952, 11 months after the effective date of the zoning ordinance, defendants leased a parking plot to a trailer owner and the first trailer moved onto defendants' tract. In the winter of 1952, defendants leased parking lots on their premises to two more trailer owners. In March of 1953, 12 trailers were parked in the trailer camp, and that number increased to 15 by Friday, May 1, 1953, the date when the hearing on the preliminary injunction was originally scheduled. On the morning of the actual hearing, Tuesday, May 12, 1953, 19 to 22 trailers were parked in the camp.

11.

In August of 1948 defendants started the construction of a lane from Cowpath Road through the center of the tract. The lane is 33 feet wide on paper. It is improved for a width of 22 feet with a base or footing of 18 inches of red shale and a blue stone top. It extends into the tract for a depth or distance of 800 feet.

12.

The excavation of two lakes or ponds on the tract was started in the summer of 1948 which supplied the red shale for the base of the lane. The purpose of the lakes is to beautify the park. They are formed by two dams. The said lane crosses the dam of the upper lake to give access to the rear of the tract which is 26 acres in area.

**13.**

The excavation contractor and defendants had a working agreement whereby the contractor dug the excavations (as well as any other holes, pits, or trenches which defendants requested) without charge, but reserved the right to sell the shale which he removed from defendants' premises and retain the proceeds.

**14.**

Defendants' total expenditure on the tract in question during the year 1948 amounted to $207 for bulldozing, digging and grading the roadway.

**15.**

During the year 1949, defendants expended the total sum of $75.15 on their premises for sand, cement, concrete block and a few pieces of lumber.

**16.**

In November of 1949, defendants left the United States for a trip to Germany and did not return home until March of 1950.

**17.**

With regard to the year 1950, defendants spent $240 for an electrical installation, $152.70 for Orangeburg sewer pipe, and $240 for well drilling.

**18.**

The construction of a one-story utility house in the trailer park was started in the summer of 1949 and completed in 1951 at a cost of $138.50.

**19.**

In the fall of 1949, defendants began to excavate for the installation of septic tanks, and in 1951 defendants purchased three septic tanks which cost a total of $171.24.

**20.**

On several occasions, during the years 1951 and 1952, defendant, Karl Richter, told Elmer Priest, a

building contractor, that he planned to construct single homes on the premises in question.

### 21.

When, in the spring of 1952, the said Elmer Priest heard rumors to the effect that defendants planned to use their tract for a trailer camp, he questioned Karl Richter as to whether the rumors were true, whereupon defendant replied that he had no intention of developing a trailer camp on his premises but was simply going to permit three of his friends to park their trailers on the tract.

### 22.

Defendant, Karl Richter, represented to George Hunter, Sr., that the ponds he was constructing on his premises were to be made available to the people in the neighborhood and the people who were building on his lots for use as a swimming pool.

### 23.

Defendants propose to develop an elaborate trailer camp with provision for 100 to 150 trailers and such facilities as a swimming pool, a softball field, tennis courts, and playgrounds at an estimated cost of approximately $150,000. Moreover, defendants cannot operate their trailer camp profitably unless it can accommodate at least 100 trailers.

### 24.

Except for size, there is no essential difference between the trailers in defendants' camp and the average small home. The trailers are well insulated and have all the equipment and facilities customarily seen in the average home including a modern bathroom. Each of the trailers has been jacked up away from its springs, rests on concrete foundation blocks, and is connected to water, electrical and sewage facilities.

### 25.

Most of the trailer owners have closed in the space between the ground and the floor of their trailers

with concrete blocks, wood sheathing or other building materials. Many of them have constructed flagstone or concrete patios and all of them have cultivated small lawns and flower gardens. A number of the trailers are even equipped with telephones.

### 26.

In the summer of 1952 defendants were called before the Zoning Board of Adjustment of Hatfield Township on a complaint that defendants were violating the zoning ordinance by the development and operation of the trailer park.

### 27.

On August 1, 1952, defendants appeared before the board of adjustment and presented proof that the trailer park was started on their property in 1948.

### 28.

On August 4, 1952, the board of adjustment, upon unanimous vote, found and so notified defendants, that they were within their legal rights to maintain the trailer park, since they had begun the work three years prior to the effective date of the ordinance.

### 29.

The operation of the trailer camp causes dust, bright lights, and noise which is annoying to plaintiffs and their witnesses, adjoining property owners.

*Discussion*

The first question for decision is whether or not defendants' use of their property amounted to a nonconforming use as of June 13, 1951, the effective date of the Hatfield Township ordinance which prohibited all forms of business in R-100 residential districts, and provided for single-family dwellings with a minimum frontage of 100 feet and lot area of 15,000 square feet.

At the outset it should be noted that no significance is to be given to the letter written to defendant, Karl Richter, by the board of adjustment indicating that he was within his legal rights in maintaining the trailer camp, since it was established three years before the zoning code became effective. This was an unofficial proceeding and amounted to nothing more than a statement by the board indicating that no summary proceedings were to be instituted against defendants. To give effect to such action would be to deprive adjoining property owners of their rights because of an informal correspondence of which they had no notice and from which they had no appeal. We therefore must make an independent review of the facts to determine whether or not defendants' activities amounted to a nonconforming use.

As of June 13, 1951, the effective date of the zoning ordinance, defendants had constructed a dirt and shale road at a cost of $207; purchased sand, cement, concrete block and lumber at a cost of $75.15; installed electrical apparatus at a cost of $240; drilled wells at a cost of $240; purchased materials and began construction of a small utility house at a cost of $138.80; purchased sewer pipe, $152.70, and septic tanks, $171.24, and constructed two ponds for beautification. The ponds and the balance of the road costs were paid for by permitting the contractor to keep the shale removed from the excavations.

Even assuming that all of the foregoing expenditures were directed toward use as a trailer camp, it is doubtful that they could be said to constitute an existing use as of the effective date of the ordinance. The estimated cost of the full development is $150,000. When proportionately viewed, and in consideration of the fact that no trailer space was rented until 11 months after the ordinance was enacted, it can readily be seen that defendants' activities rose to little more

than an intention. As was said in Harrisburg v. Pass, 372 Pa. 318 (1953), at page 324:

"There is no merit in defendants' argument that their property qualifies as a nonconforming use under . . . the ordinance, which provides that a nonconforming use in existence at the time of the adoption . . . may be continued subsequently. There was no use of any kind in existence when the ordinance was adopted; clearly, the mere fact that a particular use may have been in the contemplation of the owners would not bring the property within the coverage of the section in question."

While it is true that the use for which property is adopted need not necessarily be in active operation at the time of the adoption of the ordinance (Haller Baking Company's Appeal, 295 Pa. 257 (1928)), it equally is true that the work done must be substantial in proportion to the whole, and the attending circumstances must clearly bear out the conclusion that the owner intended to use the property for that purpose.

In connection with the latter point, there was testimony to indicate, and the chancellor so finds, that defendants originally erected the ponds to provide swimming pools for those who were to build homes on his property. The shale road would also have been a necessary means of access for the use of those building homes.

Defendants next argue that by virtue of the moneys and labor expended they have acquired a vested right to proceed with the development of their trailer camp.

In Dunlap Appeal, 370 Pa. 31 (1952), contractors had spent almost $28,000 from 1928 to 1930 for installation of water, sewer and gas mains in accordance with an established plan. Laterals had been installed to accommodate row housing, and it was conceded that maximum use of the improvements could be made only if such housing were permitted. At the time of

the installation, as in the case at bar, no permit for the improvements was required or issued and no zoning ordinance prohibited this type of house. In upholding the denial of a variance, the court said at pages 33, 34:

"Appellants could not by laying pipes and sewers in the ground forever defeat the right of the community to decide by appropriate legislative action the *type of homes* which it might thereafter desire to permit. . . .

"We adhere to the rule that a vested right to build *in future* a structure which violates a zoning ordinance can only be acquired by first securing a permit and thereafter expending substantial sums in reliance thereon. . . .

"It has never been the rule that a zoning ordinance must permit each owner to make *maximum* use of his property. Limitation of use is fundamental to all zoning and formed the basis for the earliest constitutional attacks: Euclid v. Ambler Realty Co., 272 U. S. 365; White's Appeal, 287 Pa. 259, 134 A. 409."

It seems quite clear that in this most recent Pennsylvania Supreme Court decision, the court has stated that before one can be said to have a vested right to complete a construction, a permit must have been issued and substantial sums expended in reliance thereon. These factors being absent in the case at bar, defendants cannot avail themselves of this principle.

Next, defendants contend that section 1006 of the Zoning Ordinance of Hatfield Township which provides as follows:

"No trailer camp and no tourist cabins shall be permitted in any district.

"No trailer or tent shall be permitted to be used as a place of residence in any district for a longer period than fourteen (14) days in any twelve consecu-

tive months", is unconstitutional because it is unreasonable, confiscatory, discriminatory, and does not promote the health, safety, morals and general welfare of the Township.

We shall first consider the second paragraph which sets up a standard for the determination of "residence".

The purpose of the building code is specifically stated in section 100 of the zoning ordinance, and reads, inter alia:

". . . to lessen congestion on the roads and streets; to secure safety from fire, panic, and other dangers; to promote health, sanitation, and the general welfare; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements, and to promote the health, safety, morals, and general welfare of the Township of Hatfield. . . ."

The law in Pennsylvania is clear that if the regulation bears a reasonable relation to the public safety, health, morals and general welfare, it is valid, and it matters not how severe the restriction.

Lower Merion Township v. Gallup, 158 Pa. Superior Ct. 572 (1946), held that a section of the township building code which fixed 30 days as a test period for determining whether a house trailer was transient and thus in legal use, or settled and fixed and therefore subject to dwelling house requirements, was as valid as the building code itself.

In the second paragraph of section 1006 as above cited, the township has set up a 14-day period in any 12 consecutive months as its test. While this seems a far sterner test than that in the Gallup case and considerably more difficult of enforcement, since the 14 days can have been distributed over a period of 12

months, the chancellor nonetheless is of the opinion that it is entirely within the power of the township to set up its own standards of permanency so long as it is reasonable and not an absolute prohibition.

As to the first paragraph which is a prohibition of the very existence of trailer camps and tourist cabins, the chancellor is of the opinion that such an ordinance is unreasonable, discriminatory, bears no relation to health, safety, morals or the general welfare and is, therefore, unconstitutional. The enabling act, the Second Class Township Code, 53 PS §1903-2001, empowers the authority to "regulate and restrict". Nowhere is there to be found a power to arbitrarily prohibit. That paragraph is however severable from the rest of section 1006 which, as aforesaid, is a reasonable incident to the building code.

Finally, defendants contend that the R-100 residential district regulations providing for minimum lot areas are unconstitutional as applied to defendants' trailer park because they are unreasonable, arbitrary, discriminatory and confiscatory.

The sole issue for determination in this respect is whether or not a house trailer should be treated as a "dwelling house" within the meaning of a zoning ordinance or a building code.

In Lower Merion Township v. Gallup, supra, the court said at page 575:

"A house trailer is simply a mobile house. It is as much a dwelling as any house which is built on a foundation and therefore not mobile. Indeed these house trailers were not resting on wheels but were 'up on boxes, or some jacks of some sort' . . . Sidewalks leading to each were constructed. Each was connected with water and electric lines. . . .

"To say that these were not dwelling houses is an attempt to fictionalize a reality. They were used and

intended to be used as homes, and were as much dwellings as any similar sized structures could be."

The testimony in the case at bar clearly indicates that the house trailers on defendants' property were used as residences in every sense of the word, and as such are subject to valid township ordinances pertaining thereto: Palumbo Appeal, 166 Pa. Superior Ct. 557 (1950) ; Lower Merion Township v. Gallup, supra.

In Commonwealth v. Helmuth, 73 D. & C. 370 (1949), the court, in rejecting the contention that a zoning ordinance was not intended to apply to trailers in a trailer camp, said, at page 371:

"In our opinion the calling of this particular piece of land a 'trailer camp' in no way distinguishes it from land of similar size which might be devoted to permanent homes."

It is concluded therefore that since the trailers in question have been immobilized and rest on concrete foundations; are connected to water, electrical and sewage facilities; that since many of the trailer owners have closed the space between the ground and the floor of their trailers with concrete blocks, or other building materials; that since many have constructed flagstone patios, installed telephones, cultivated small lawns and gardens, there can be no doubt that they are intended for and are in fact used as residences and are "dwellings" or "dwelling houses" within the meaning of the Hatfield Township Zoning Ordinance.

### Conclusions of Law

#### 1.

Equity has jurisdiction.

#### 2.

The premises of both plaintiffs and defendants are located in an R-100 residential district.

## 3.

Defendants' plan (to develop a large trailer camp with provision for 150 trailers, baseball diamonds, picnic areas, playgrounds, etc., at an estimated cost of $150,000) was not, on the effective date of the zoning ordinance, so near completion that it constituted a nonconforming use in existence prior to the ordinance.

## 4.

The letter written to defendants by the Zoning Board of Adjustment informing him that he was within his legal rights in developing his trailer camp was ineffective insofar as it attempted to confer upon defendants a nonconforming use, and has no bearing upon these proceedings.

## 5.

The expenditures made by defendants prior to the effective date of the zoning ordinance were not sufficiently substantial in relation to the total investment contemplated so as to entitle defendants to a vested right to develop a trailer camp. Furthermore, none of the expenditures regardless of when made, were in reliance upon any building permit.

## 6.

That portion of article X, sec. 1005, which reads, "No trailer camps and no tourist cabins shall be permitted in any District . . ." is unconstitutional because it is prohibitive, unreasonable, discriminatory, confiscatory, and does not bear sufficient relation to the health, safety, morals, and general welfare of Hatfield Township.

## 7.

That portion of article X, sec. 1006, which reads, "No trailer or tent shall be permitted to be used as a place of residence in any District for a longer period than fourteen (14) days in any twelve consecutive

months . . ." is severable and is valid as a proper standard by which to distinguish between a transient use, and a permanent use, the latter being classified as a "dwelling house", within the meaning of the zoning ordinances and building code of Hatfield Township.

8.

Article V, secs. 500-509, establishing the requirements for R-100 residential districts may be properly applied to house trailers brought into defendants' trailer camp subsequent to June 13, 1951, and is not unconstitutional as so applied.

9.

The house trailers on defendants' premises, which are mounted on concrete blocks rather than wheels and connected with water, electric and sewer lines and remaining within the township for more than the 14-day period permitted by the zoning ordinance are "dwellings" within the meaning of the Hatfield Township Zoning Ordinance and as such must conform to the minimum area and minimum lot frontage requirements established for R-100 residential districts in Hatfield Township.

*Decree Nisi*

And now, May 3, 1955, a preliminary injunction having heretofore issued restraining defendants from increasing the number of trailers in said trailer park beyond 22, so as to preserve the status quo until final hearing, and an approved bond having been filed, and after a full final hearing, for the reasons set forth in the foregoing findings and conclusions, it is hereby ordered, adjudged and decreed that defendants, Karl Richter and Herta Richter, his wife, individually and trading as Lakeside Trailer Park, are hereby permanently restrained and enjoined from operating a trailer park business on their premises situate on Hatfield Valley Road in Hatfield Township, and de-

fendants are ordered to cause the removal of the house trailers that are now on their property within 60 days of this decree, and said defendants are further enjoined from permitting house trailers to park on their premises for a period in excess of 14 days in any 12 consecutive months in violation of the Hatfield Township Zoning Ordinance.

Defendants to pay the costs.

Notice to be given by the prothonotary, as required by the rules of equity practice, that unless exceptions are filed within 10 days from this date, the decree nisi will become the final decree as of course.

### Opinion Sur Exceptions

DANNEHOWER, J., March 1, 1956.—After a full and final hearing the chancellor issued a permanent injunction enjoining defendants from operating a trailer park business on their premises and from permitting house trailers to park on their premises for a period in excess of 14 days in any 12-month period in accordance with the provisions of the township ordinance. Defendants have filed 42 exceptions to the adjudication, part of which are addressed to the chancellor's refusal to affirm defendants' requests for findings of fact and conclusions of law. These exceptions have been argued before the court en banc and are now before us for decision.

By the nature and extent of defendants' exceptions, it is apparent that what is sought is a reconsideration of the entire proceedings. We shall endeavor to discuss as briefly as possible those exceptions and contentions which merit rediscussion, although the exceptions directed to the chancellor's refusal to find as requested will be treated more specifically.

A review of the record convinces us that the findings of fact and conclusions of law as they appeared in the adjudication are correct as stated and are supported by a preponderance of the credible evidence. It is un-

disputed that the first trailer moved onto defendants' premises in May of 1952, 11 months after the effective date of the zoning ordinance which excluded trailer camps from R-100 residential districts. The testimony and exhibits of defendants further disclose that only a small fraction of the cost of the entire project had been expended prior to the enactment of the ordinance. The law is well settled that in order to acquire a nonconforming use by reason of a partial construction the work done must be substantial in proportion to the whole. Moreover, in order to enable the owner of property to claim such a right he must establish that his expenditures were made in reliance on a building permit previously issued to him: Gold v. Building Committee of Warren Borough, 334 Pa. 10.

We shall next consider defendants exceptions to the chancellor's refusal to make findings of fact as requested. These exceptions will be condensed and combined whenever possible.

Exceptions 12 through 15 claim that the chancellor erred in refusing to find as a fact that defendant Karl Richter's ill-health and lack of capital prevented him from expediting the construction of the proposed trailer camp so as to have enabled him to have completed the project before the effective date of the ordinance. We cannot see how these factors have any relevancy to the issues involved. It is possible to conjecture that defendants might have completed the trailer camp prior to the ordinance but for Karl Richter's ill-health and lack of funds, but the law with respect to the vesting of rights in nonconforming uses does not look to what might have happened, but rather to what did happen. The exceptions therefore have no merit and are accordingly dismissed.

Exception 16 cites the chancellor as being in error in failing to find as a fact that: "In 1948 there were no local regulations relating to trailer parks in Hatfield

Township." We have omitted this simply because it is not pertinent to the case. However, such is a fact. The complaint does not refer to the use defendants made of their land in 1948, but to the illegal use subsequent to the zoning ordinance in 1951, and to the fact that such use constituted a violation. The exception is therefore dismissed.

Exceptions 17 and 18 relate to the chancellor's failure to find as a fact that the construction of the lakes and roadway, if contracted for cash, would have cost in excess of $12,000. We have made no such finding because it is not supported by the facts. The record of testimony discloses that nothing had been paid for this construction but that the work was performed under an agreement with one Frank Scholl who, in return, was permitted to remove all the shale he needed from defendants' premises. Moreover, the removal of the shale had begun in 1947 and at that time defendants had expressed their intent of wanting to beautify their land and improve it for the development of lots for single dwellings. The exceptions are therefore dismissed.

Defendants' exception 19 alleges that the chancellor erred in refusing to find that the lakes which had been constructed tend to make the land more valuable as a trailer camp and correspondingly reduce its value as a residential development. Such a finding would have no bearing on the issues. Moreover, there was no expert testimony to this effect. The exception is accordingly dismissed.

Exceptions 20 to 29 charge that the chancellor erred in refusing to find as facts that a sewage system, trenches and runways were constructed to accommodate up to 35 trailers and that over 2,000 seedlings were planted to beautify the tract as a trailer park. It is true that defendants incurred certain expenditures in the improvement of their property and that

by 1952 they manifested their intent to operate a trailer park business. However, there is serious doubt that they had such an intent in 1947 when improvements were first begun. The testimony of Karl Richter discloses that he had constructed the lakes and driveway ". . . to beautify the ground . . .", and to make the tract suitable for the development of single dwelling lots. It is undisputed that no trailers appeared on defendants' tract until nearly a year after the passage of the zoning ordinance in 1951. The partial construction of trenches and sewage system was not in substantial proportion to the entire project so as to allow defendants a nonconforming use. The findings then, requested by defendants, are not pertinent to the issues, and the exceptions are therefore without merit and must be dismissed.

Finally, defendants except to the chancellor's failure to find that defendants proceeded with the development of the trailer park in reliance on the "finding of the Board of Adjustment of August 4, 1952, . . .". The record is clear that no official action was taken by the Board of Adjustment of Hatfield Township with respect to defendants' use of their property as a. trailer park. The information supplied to defendants by the board was merely advisory in nature and did not operate to affect the rights of adjoining property owners who had no notice of the proceedings and who were not given an opportunity to voice their objections at a public hearing. The exception is therefore without merit and is accordingly dismissed.

All the exceptions raise substantially the same questions which were raised at the hearings, asserted in the briefs and argued before the court and are fully answered by the chancellor in his adjudication. We have reviewed and examined the facts found by him and are of the opinion that they are amply supported by the competent and credible evidence adduced in the

case. We likewise concur with the chancellor's inferences and conclusions of law from those facts. Aside from what has been said before, there is little we can add to what the chancellor has so fully set forth in his adjudication. Defendants' exceptions are therefore dismissed and we enter the following

*Final Order and Decree*

And now, March 1, 1956, for the foregoing reasons, all exceptions filed by defendants are hereby dismissed, and the decree nisi granting a permanent injunction entered May 3, 1955, is hereby entered as the final judgment and decree of the court. An exception is allowed defendants.