**Boyd Appeal**

2

*A. G. Helbling*, for appellant.
*Robert E. Kunselman*, Township.
*John Petrosh*, zoning hearing Board.

KLEIN, J., August 27, 1974.—We have before us an appeal by Marsha Boyd from the decision of the Zoning Hearing Board of New Sewickley Township denying appellant's request for a permit, variance or special exception to place a "mobile home" in an "Agricultural District," and further, rejecting her challenge to the validity of the applicable provisions of the zoning ordinance.

Although the zoning hearing board failed to comply with its statutory duty to keep a stenographic record of the proceedings, (Act of July 31, 1968, P. L. 805, as amended, 53 PS §10908(7)) due to the stenographer's inability to decipher her notes, the facts are not in dispute. The facts are set forth in the board's decision and are agreed to by both parties. No additional testimony was necessary or taken.

It is clear that, under the statute, the case law and the instant facts, appellant is not entitled to a variance or a special exception. See 53 PS §10912 and §10913; Walter v. Philadelphia Zoning Board of Adjustment, 437 Pa. 277 (1970); Di Santo v. Zoning Board of Adjustment, 410 Pa. 331 (1963), and numerous other cases.

Consequently, the herein appellant may prevail only if entitled to a permit under the general terms of the ordinance or if the applicable provisions of the zoning ordinance are invalid. We hold that they are invalid and, in any event, appellant is entitled to a permit under the ordinance.

### STATEMENT OF FACTS

1. Marsha Boyd is the daughter of Harry Boyd and his wife, Thelma Boyd.

2. Harry and Thelma Boyd reside within New Sewickley Township on a farm of approximately 35 acres, which they own.

3. Such farm is located near State Route 68 north of the Village of Unionville.

4. Such farm is located within an area designated as an "Agricultural District" by the official zoning districts map included in the Zoning Ordinance of New Sewickley Township.

5. Harry and Thelma Boyd have leased to Marsha Boyd one acre of unimproved land from the aforesaid farm. The leased premises are adjacent to a private driveway, approximately 700 to 800 feet from Route 68.

6. Marsha Boyd is the owner of a house trailer or mobile home, the dimensions of which are approximately 12 feet by 48 feet.

7. Marsha Boyd desires to move this house trailer or mobile home onto the leased premises, place it upon and attach it to a foundation of concrete blocks, make connections with available utility services, and occupy it as her permanent residence. She also plans to construct a 12-foot by 24-foot addition which will be permanently attached to said "mobile" home, together with a 10-foot by 20-foot concrete porch, or patio, area, all of which is contained in her application for permit.

8. Harry and Thelma Boyd, the lessors and landowners, consent to this proposed action by Marsha Boyd.

9. Numerous other residents of New Sewickley Township have signed written petitions stating that they approve of such proposed action of Marsha Boyd.

10. There is no reason to believe that the leased premises here involved has any unique physical conditions or circumstances which create hardship to Marsha Boyd.

4

## PERTINENT PROVISIONS OF
## THE ZONING ORDINANCE
### "ARTICLE IV
*"Definitions*

*"Section 401.* MEANING OF WORDS.

"BUILDING OR STRUCTURE: Anything constructed or erected, the use of which demands a permanent location on the soil, or attached to something having a permanent location on the soil.

". . .

"DWELLING: A house, apartment building or other structure used primarily for human habitation. The word "dwelling" shall not include hotels, motels or other structures used for transient residence nor shall it include house trailers unless they are specifically included.

". . .

"DWELLING, SINGLE-FAMILY: A detached building designed for or occupied exclusively as a residence for only one family.

". . .

"MOBILE HOME: A portable dwelling unit designed and built to be towed on its own chassis, connected to utilities, and occupied on a year-round basis. The unit may contain parts that collapse, fold, telescope or otherwise permit continued mobility; however, these characteristics shall not categorize it as a sectional or modular home.

"Two portable units designed and built to be towed on their own separate chassis and permanently combined onsite to form a single immobile dwelling unit shall be regarded as a single-family detached dwelling.

". . .

"TRAILER: Any licensed or unlicensed piece of mobile equipment designed or constructed to be towed or pulled by a motor vehicle.

". . .

"ARTICLE V

"*Zoning Districts*

"Section 500. ESTABLISHMENT OF DISTRICTS.

"For the purpose of applying the regulations, restrictions and provisions of this Ordinance, the Township of New Sewickley is hereby divided into the following Zoning Districts:

"R-1 Rural Residential District

"R-2 Suburban Residential District

"C Commercial District

"I Industrial District

"A Agricultural District

"S Special Conservation District

" . . .

"ARTICLE VII

"*Permissive Uses*

"Section 700. R-1 RURAL RESIDENTIAL DISTRICT.

"A. Principal Uses

"1. Single-family detached dwellings.

" . . .

"Section 701. R-2 SUBURBAN RESIDENTIAL DISTRICT.

"A. Principal Uses

"1. Single-family detached dwellings.

"2. Mobile homes.

"3. Mobile home parks as required in Township Ordinance 43, as amended.

" . . .

"Section 704. A AGRICULTURAL DISTRICT.

" . . .

"2. Single-family detached dwellings.

" . . .

" [There is no minimum living area requirement for residences, only minimum lot and area requirements; building set back lines, yard area requirements, etc.]

"ARTICLE VIII

"*Supplementary Regulations*

". . .

"Section 809. MOBILE HOME AND CAMPING AND RECREATIONAL EQUIPMENT STORAGE.

"Trailers as defined within the terms of this Ordinance and including mobile homes, travel trailers, pickup coaches, motorized homes and boat trailers may be parked or stored subject to the following requirements.

"A. Mobile homes may be parked and occupied only in the R-2 Suburban Residential District.

"B. At no time shall parked or stored camping and recreational equipment be occupied or used for living or housekeeping purposes.

"C. Camping and recreational equipment may be parked on any property and used for temporary residential purposes for a period not to exceed thirty (30) days. And temporary use of such equipment beyond a period of thirty (30) days may be permitted only upon obtaining a permit therefor from designated Township Officials. Such permit for the temporary use of such equipment shall be valid for a period of fifteen (15) consecutive days and shall be subject to renewal. No charge will be made for the issuance of such permit."

ANALYSIS OF PERTINENT PROVISIONS OF
THE ZONING ORDINANCE AS
APPLICABLE HEREIN

The *herein structure* proposed to be placed upon the land meets the ordinance' definition of "building or structure." Appellant proposed not just a "mobile" home but one altered by the addition of a 12-foot by 22-foot permanent "building or structure," together with a 10-foot by 22-foot cement patio, as well as removing the parts which give it mobility.

And although the ordinance' definition of "dwelling" states that it does not include "house trailers unless they are specifically included," the herein structure is not a "house trailer" for the same reasons stated in the preceding paragraph, as well as because of the current difference in shape and external siding between "mobile homes" and "house trailers." Yet further, as we will hereinafter elaborate upon, the instant ordinance distinguishes between (or at least seems to distinguish between) "trailers" and "mobile homes," as it should.

Included in the "definition" of "mobile home" in its second and concluding paragraph is the following:

"Two portable units designed and built to be towed on their own separate chassis and permanently combined onsite to form a single immobile dwelling unit shall be regarded as a single-family detached dwelling."

Obviously then, a mobile home is not forbidden in certain districts, including the herein "Agricultural District," because of "aesthetic" or "effect on property value" considerations of the "general welfare" rule. The ordinance thereby makes minimum area the criterion for mobile homes but not for other "single-family detached dwellings." That provision is patently invalid.

The most vague and confused provision of the ordinance is set forth in full above and is section 809, entitled "Mobile Home and Camping and Recreational Equipment *Storage*" (Emphasis supplied). Under section 809 it provides: "Trailers . . . and including mobile homes, travel trailers, pickup coaches, motorized homes and boat trailers," but not mentioning "house trailers." It then goes on to provide: "Mobile Homes may be parked and occupied only in the R-2 Suburban Residential District," and that parked or

stored *camping and recreational equipment* may not be used for living purposes, but that such equipment may be parked *on any property* and used for temporary residential purposes for a period not to exceed 30 days, subject to permit for additional 15-day periods, apparently without limitation.

Does this section mean that "travel trailers" and "motorized homes" may be parked and occupied anywhere in the Township? That's what it says by clear implication, although a different intent may be discovered by reading the ordinance as a whole. If so, of course, it would be unconstitutional discrimination against owners of "mobile homes," and such provisions must be strictly construed!

## DISCUSSION

This case involves a couple's wish to lease one acre of their 35-acre farm to their daughter and upon which parcel of land the daughter intends to place a 12-foot by 44-foot mobile home. Their purpose is to have parents and daughter living in close proximity to one another on the family farm. The zoning officer, under the ordinance, refused to grant a permit for same. And the zoning hearing board denied the appeal from that decision. Hence, this appeal.

At first blush, to most, this may appear to be a relatively unimportant case, just some "ordinary people" with what others might deem a relatively minor problem. However, after careful review and reflection, we deem it a case of the utmost importance, involving issues of constitutional dimension as well as issues of simple justice.

This court's view of the matter before us was expressed by the late Chief Justice Bell in the case of Lord Appeal, 368 Pa. 121 (1951):

"The question narrowly stated at the commencement of this opinion actually involves broad and

fundamental rights of every property owner in the United States and the opposing right of a governmental body to restrict or destroy these rights. In England in ancient times land was holden of the King, whose power was supreme. As the King's power decreased and the power of his nobles increased, slowly the right, first of the nobles and then of every land owner to freely and absolutely own, possess and enjoy the land which he owned in freehold, became recognized by all as a sacred, absolute, inviolable right. It was considered a part of his fundamental liberty, a very important part of the fundamental law which was the supreme law of the land and which was called the Common Law because it was given to all in common. A large part of the law in the Middle Ages was necessarily concerned with property. Over the centuries, statutes were enacted which declared and safeguarded the rights and ancient liberties of the people which had arisen by immemorial usage or custom 'Whereof the memory of man runneth not to the contrary'. The principle of the sanctity of private property underlies several articles of Magna Carta.

"In the Industrial Age the pendulum slowly but surely turned backwards. Gradually the landowners' rights became less absolute, and the maxim of the Roman Law (Sic utere tuo ut alienum non laedas) to so use your own land as not to injure another, was adopted and became part of the common law of England. This endless swaying struggle between the rights of a Sovereign and the rights of an individual was resolved in America by alloting [sic] to each certain rights, powers and boundaries. Both our Federal and State Constitutions provide for and guarantee to every citizen certain unalienable rights and liberties; and with respect to property limit the paramount right of the Sovereign State to take an owner's

land for a public use only, and even then, only if it pays the owner just compensation: Fifth and Fourteenth Amendments to the Constitution of the United States; Article I, §10, Article XVI, §8, Constitution of Pennsylvania.

"More recently, i.e., in the last 25 years, the swing of the pendulum in favor of sovereignty has been precipitated because of wars, a depression, and the complexities of modern life. This trend has taken the form of planning commissions and zoning boards, which have become very fashionable; and their acts, ordinances or regulations have tended to further restrict an owner's right in his own land.

"While it is obviously true that the ancient adage of Coke (originally found in Staumford's 'Pleas of the Crown' in 1557), that 'A man's house is his castle', is, in the words of Rudyard Kipling 'One with Nineveh and Tyre', an owner of property is still entitled in Pennsylvania to certain unalienable constitutional rights of liberty and property. These include a right to use his own home in any way he desires, provided he does not (1) violate any provision of the Federal or State Constitutions; or (2) create a nuisance; or (3) violate any covenant, retriction [sic] or easement; or (4) violate any laws or zoning or police regulations which are constitutional. It is now well settled that zoning acts and ordinances passed under them are valid and constitutional as structural or general legislation whenever they are necessary for the preservation of public health, safety, morals or general welfare, and not unjustly discriminatory, or arbitrary, or unreasonable, or confiscatory in their application to a particular or specific piece of property: White's Appeal, 287 Pa. 259, 134 A. 409; Taylor v. Moore, 303 Pa. 469, 154 A. 799; Kline v. Harrisburg, 362 Pa. 438, 451, 68 A. 2d 182; Jennings' Appeal, 330 Pa. 154, 198

A. 621; Ward's Appeal, 289 Pa. 458, 137 A. 630; Bryan v. City of Chester, 212 Pa. 259, 61 A. 894; Taylor v. Haverford Township, 299 Pa. 402, 149 A. 639; Perrin's Appeal, 305 Pa. 42, 48, 156 A. 305; Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S. Ct. 114; Penna. Coal Co. v. Mahon, 260 U.S. 393, 43 S. Ct. 158; St. Louis Poster Advertising Co. v. St. Louis, 249 U.S. 269, 39 S. Ct. 274; Eubank v. Richmond, 226 U.S. 137, 33 S. Ct. 76.

"Restrictions imposed by zoning ordinances are, however, in derogation of the common law and (at times) of the liberties, rights and privileges guaranteed by the Constitution of the United States and the Constitution of Pennsylvania and therefore must be strictly construed: Lukens v. Zoning Board of Adjustment, 367 Pa. 608, 80 A. 2d 765; Kline v. Harrisburg, 362 Pa. 438, 451, 68 A. 2d 182.

". . .

"Our forefathers came to America seeking Liberty— liberty of thought, of speech, of religion, and of freedom from interference with their property or lives. It was probably because of this historical origin and development of our Country and the rights, privileges and immunities guaranteed by our Constitution, some of which are apparently little known or ofttimes forgotten, that this Court in the leading case of White's Appeal, 287 Pa. 259, 134 A. 409, reviewed the power of a state to take or regulate the use of private property, as well as the difference between the police power and the power of eminent domain. The Court, in a clear and comprehensive opinion, reiterated certain fundamental principles and laid down certain guideposts to aid legislative bodies and zoning commissions in their consideration of prospective laws, ordinances or regulations which might affect the health, safety or welfare of a community on the one hand, and on

the other hand, interfere with certain unalienable rights of every citizen. The legislative power is so well known and the constitutional rights of an individual are today so little known, that we shall quote only those parts of the Court's opinion which deal with the limitations of legislative bodies and the corollary rights of citizens (pages 265, 266, 267):

" '. . . all property is held in subordination to the right of its reasonable regulation by the government clearly necessary to preserve the health, safety or morals [or general welfare] of the people . . . . There is one matter that is quite certain, the power to thus regulate does not extend to an arbitrary, unnecessary or unreasonable intermeddling with the private ownership of property, even though such acts be labeled for the preservation of health, safety and general welfare . . . . While such regulations may not physically take the property, they do so regulate its use as to deprive the owner of a substantial right therein without compensation. "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change": Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 416 . . . . "To secure their property was one of the great ends for which men entered society. The right to acquire and own property, and to deal with it and use it as the owner chooses so long as the use harms nobody, is a natural right. It does not owe its origin to constitutions. It existed before them. It is a part of the citizen's natural liberty —an expression of his freedom—guaranteed as inviolate by every American bill of rights": Spann v. Dallas, 111 Tex. 350, 235 S. W. 513 . . . . Each case must of course be decided on its own facts. . . . Where a statute or ordinance interferes with the use

and control of property without rational relation to public safety, health, morals or general welfare, or is a palpable invasion of rights secured by the fundamental law, the enactment cannot be sustained as a legitimate exercise of police power. . . . To bring this, and other like regulations, under the police power, would be to sweep away constitutional guarantees on the ownership of property. It is regulation run mad.' "

In addition to the facts enumerated in the first paragraph of this discussion, it should also be kept in mind that the appellant, Marsha Boyd, in her application to the Zoning Officer, also indicates her intention to remove the wheels and other parts which, together provide the mobility of the "mobile" home; place the body upon a concrete block foundation, with concrete footer; and then attach to that body, a 12-foot by 24-foot structural addition, also being on the concrete block foundation and making a single, solid permanent dwelling. To complete the residence, appellant also plans construction of a 10-foot by 20-foot porch or patio area.

To merely state the proposition is to reveal the arbitrariness and unreasonableness of the pertinent provisions of the ordinance in these permises. This is particularly true in the instant case because the location is 700 to 800 feet from the public highway and NOT VISIBLE therefrom. Consequently, we hold that the provisions *of the herein ordinance* with respect to excluding the placing of a solo, single-family dwelling "mobile" home which, IN FACT has been "immobilized" in the "A Agricultural District" where residences are permitted, to be invalid by reason of being arbitrary and an unnecessary and unreasonable intermeddling with the private ownership of property. Further, we hold that such provisions are unconstitutional as being

in violation of the fifth and fourteenth amendments to the Constitution of the United States of America; and in violation of article I, sec. 10, and article X, sec. 4, of the Constitution of the Commonwealth of Pennsylvania.

We, of course, recognize the vital need for municipalities to enact zoning ordinances for the public health, safety, morals and general welfare but all must guard against "regulation run mad." We hasten to declare that we have no doubt that the responsible municipal officials of New Sewickley Township have acted in good faith, with advice and counsel from experts and with the sole aim of preserving the health, safety, morals and general welfare of the community.

The controlling law is set forth by the Supreme Court of Pennsylvania in the case of Anstine v. Zoning Board of Adjustment, 411 Pa. 33 (1963) in an opinion by Justice (now Chief Justice) Jones.

The case of County of Fayette v. Holman, 11 Comm. Ct. 357 (1973), is distinguishable on its facts. As was pointed out by Judge Mencer in his concurring opinion, the crucial fact was that Holman merely removed the wheels and supported the structure with masonry blocks under its corners *only*. Thus, the Holman structure was lacking an essential ingredient of an "immobile" dwelling—a full perimeter foundation attached to the soil. The essence of this distinguishing fact is specifically mentioned by the Supreme Court in Anstine, supra, when it went on to say:

"The record shows that appellants' mobile home is 8′ wide and 41″ long and has, accordingly, 328 square feet of living space; a housing construction expert testified that the average conventional dwelling house contains 720 square feet, but he classified appellants' dwelling as 'a small home, but not an extremely small one.' The interior height of their dwelling is 7′2″

and there is a structural steel frame with an exterior siding of aluminum; an expert witness compared the construction of the frame of appellants' dwelling to that of a conventional home and declared them to be structurally similar. Likewise, the interior plywood covering on the walls and floor of appellants' dwelling and the insulation between the exterior covering and the interior covering are basically similar to the building materials which would be used in a conventional dwelling house. The living space within the mobile home consists of a living room-dining room, a kitchen with a double sink, hot and cold running water, a four-burner gas stove, a bathroom with a regular size bath tub, lavatory, commode and hot and cold running water. Appellants' two children sleep in the 8' x 8' bedroom and appellants sleep on a roll-out bed in the adequately furnished living room. The mobile home is equipped with city water facilities, electricity, telephone service, a septic tank located beneath the mobile home and a fuel oil heating unit and it presently rests on concrete blocks and is surrounded by two acres of land. Appellants have specifically requested the Township for permission to remove the wheels presently attached to the undercarriage of the mobile home and to place the structure on a concrete block foundation. Thus, the mobile home will be rendered immobile and will be permanently affixed to the block structure. A 12' x 15' cement patio with a 2' wall constructed on either side and an awning to cover the patio is planned. The record shows that this structure could be moved after these improvements are effected only with the same degree of difficulty and harm to the structure as would accompany the moving of a conventional dwelling house.

"Certain conclusions flow from this evidence. The question of what best serves the public interest is pri-

marily a question for the decision of the appropriate legislative body in a given situation, but whether a zoning ordinance operates in an arbitrary, capricious, discriminatory or confiscatory manner as to the property in question calls for judicial determination: Bilbar Construction Co. v. Easttown Twp. Board of Adjustment, supra, In our opinion, a review of the record shows that the refusal to grant appellants permission to improve their mobile home is arbitrary and discriminatory. Only single family dwellings are allowed within the R-Residential District and, if appellants are permitted to go forward with their improvements, the resulting structure clearly would be a single family dwelling, albeit a small dwelling, within the definition of the ordinance. Their plans involve the removal of the mobile home's undercarriage to which the wheels are attached and the bolting of the structure to a concrete block foundation and the proposed addition of a concrete patio covered by an aluminum awning clearly creates a fixed rather than a mobile structure. The record shows that the structural construction of this home differs from that of a conventional home only to the extent that it is of a smaller scale. The degree of difficulty in physically moving the structure is the same. Setting aside for the moment all niceties of definition, appellants' request envisions the maintenance of a permanent and immobile house within this residential area."

The majority opinion in Holman, also recognizes Anstine, supra, as the law of the Commonwealth on the subject. That is, an immobile structure cannot be, at one and the same time, also a mobile structure. To illustrate by extreme example: Suppose a municipal body included in the definition of mobile home "a frame dwelling house so constructed and so placed upon a concrete foundation that it may, without

inordinate difficulty, be removed and transported for placing upon a foundation in another location (as many are)." Would that definition make it a "mobile" home? Certainly not. No provision in a law or ordinance which, merely by definition decrees so, can make an object black when, in fact, it is chartreuse. Such a provision would be void by reason of simple good sense. And the herein ordinance specifically recognizes that sectional and modular homes, which differ from mobile homes in size and shape but which are similar in the fact that all are constructed off the premises, are as "conventional" frame or brick homes, "single-family dwellings."

The court, in Holman, opined that Anstine did not hold that mobile homes may not be excluded from a residential district under any circumstances. We agree. However, Anstine merits further analysis in depth to determine the extent of its applicability to the instant case, which was not required in the Holman case as aforesaid. The thrust of Anstine is set forth in Chief Justice Jones' opinion, thusly:

"In our opinion, a review of the record shows that the refusal to grant appellants permission to improve their mobile home is arbitrary and discriminatory. Only single family dwellings are allowed within the R-Residential District and, if appellants are permitted to go forward with their improvements, the resulting structure clearly would be a single family dwelling, albeit a small dwelling, within the definition of the ordinance. Their plans involve the removal of the mobile home's undercarriage to which the wheels are attached and the bolting of the structure to a concrete block foundation and the proposed addition of a concrete patio covered by an aluminum awning clearly creates a *fixed* rather than a *mobile* structure. The record shows that the structural construction of

this home differs from that of a conventional home only to the extent that it is of a smaller scale. The degree of difficulty in physically moving the structure is the same. Setting aside for the moment all niceties of definition, appellants' request envisions the maintenance of a permanent and immobile house within this residential area.

". . . There is in this ordinance no restraint on the use of trailers or mobile-homes other than by way of definition and there is established no minimum square footage for all single family dwelling houses as has been held to be a valid zoning standard in this Commonwealth: Lower Merion Township v. Gallup, 158 Pa. Superior Ct. 572, 46 A. 2d 35. On many occasions, a mobile home has been held, under the circumstances therein existing, to be a 'dwelling' by the courts of this Commonwealth: Palumbo Appeal, 166 Pa. Superior Ct. 557, 72 A. 2d 789; Commonwealth v. McLaughlin, 168 Pa. Superior Ct. 442, 78 A. 2d 880; Commonwealth v. Helmuth, 73 Pa. D. & C. 370; Hunter v. Richter, 9 Pa. D. & C. 2d 58; Hickory Township v. Wooddell, 4 Mercer Co. L. J. 282. In the case at bar, we deem it most arbitrary to apply the classification of 'trailer' to a structure which, when improved, will not be in fact a 'trailer' as defined, expressly or impliedly, by the ordinance or by common sense.

"The Township was presumptively acting within its delegated power when it classified mobile-homes differently than conventional homes. The record before us, however, does not show, directly or indirectly, any substantial reason for this differentiation in classification and the evidence shows clearly a condition free from health or safety hazards. The facilities in this home and its physical structure are clearly adequate and any dangers inherent in this dwelling would most likely be found in a conventional home

of the same dimensions. If this is so, the zoning ordinance should apply to all dwellings of the same or similar size, irrespective of any differences in basic construction.

". . . The instant record, patently, does not show that the maintenance of this mobile home permanently affixed to the realty will be inimical in any manner to the health, safety, or morals of its occupants or to the possessors of adjoining property in an "R-Residential" District. This Court may not speculate as to the Township's reasons underlying this special classification but, in the absence of any evidence thereof, we are bound to hold that this classification as it pertains to appellants' requested improvement is arbitrary and discriminatory and unrelated to the police powers of the Township legislative body.

". . .

"The township argues that there is a presumption that the ordinance in question was enacted to preserve the beauty˙ and property values of York Township. Thus, the Township would have us presume that the style or design of a mobile home per se detracts from the aesthetic characteristics of the community and, accordingly reduces neighboring property values and that a conventional dwelling house, no matter its unattractiveness, will not have the same effect. This is clear error."

Therefore, what the Anstine Court held was

(1) an immobile home IS NOT A MOBILE HOME merely because the structure was originally built as the dwelling portion of a mobile home on wheels and by definition in a zoning ordinance; and

(2) a "mobile" home structure does not per se detract from the aesthetic characteristics of the neighborhood, and accordingly reduce neighboring property values (especially when an ordinance will permit

location of a "conventional" dwelling house, no matter its unattractiveness (or size, for example); and

(3) whether a structure is "mobile" must be determined by the pertinent facts concerning same AT THE TIME AND PLACE IN QUESTION; and

(4) once the structure is determined to be immobile or fixed, then regulations applied to it must be IDENTICAL to those applied to any single-family dwelling and such structures may not be further discriminated against.

If one asks where does this leave such provisions in the hundreds of zoning ordinances in existence, the answer is, just where they belong. Communities which are concerned about "mobile" homes may enact minimum square footage requirements for *all* single-family dwelling houses, as well as lot and area requirements; building set back lines, side-lot lines, rear-lot lines, minimum yard area requirements, etc., always bearing in mind that mobile homes may, in a reasonable provision, be excluded from some districts SO LONG AS THEY REMAIN MOBILE, and bearing in mind also the right to impose minimum requirements for light, air, sanitation, safety, etc. See Lower Merion Township v. Gallup, 158 Pa. Superior Ct. 572 (1946), and Township of Lower Merion v. Harrison, 84 Pa. Superior Ct. 574 (1925).

## REPUBLICAN FORM OF GOVERNMENT

Ours and New Sewickley Township's is a republican form of government. That is "a state or nation [or municipality] in which the supreme power rests in all the citizens entitled to vote (the electorate) and is exercised by representatives elected, directly or indirectly, by them and responsible to them." In the instant case, the record reveals that no citizen or property owner of New Sewickley Township objected

to the application for permit. On the contrary, more than 80 citizens of New Sewickley Township, who are property owners of property situate within "Agricultural Districts", signed a petition in support of the application. However, a remedial amendment to a zoning ordinance is not a matter for judicial intervention. It is solely the prerogative of the legislative body. Incidentally, the amendment procedure gives every interested citizen the opportunity to express his or her views on the proposal: 53 PS §10609.

And, in conclusion, we must note that the "house trailers" of yesteryear are no more. The mobile homes which have been constructed in recent years are both expensive and attractive. They are constructed of such materials and so finished as to allow them to maintain their attractive appearance for more years than is true with respect to the conventional frame dwelling houses, before there is a necessity for painting or refinishing. The exterior of modern mobile homes are generally of metal siding as is the case with many conventional homes, including some in the "expensive" category. Further, the shape of the modern mobile homes as distinguished from the rounded roof line of the old fashioned house trailers, is primarily square-cornered as are conventional homes.

In what is an obvious truth but was so cogently articulated by James Russell Lowell in "The Present Crisis":

"New occasions teach new duties: Time makes ancient good uncouth; They must upward still, and onward, who would keep abreast of Truth."

Consequently, in our view, classification of residences for zoning purposes by *type of construction,* i.e., brick, frame, sectional, modular, "mobile," unless based upon public health or safety, is invalid. We do *not* hold that classification by differences of "perman-

ency" and "mobility" are invalid. But "mobility" must be determined by the pertinent facts in re the structure at the time and place in question.

Courts generally do not decide questions of constitutionality or validity of a legislative enactment when the case, as the instant one, can be decided without reaching such issues. However, we deem it desirable in this instance because problems with "mobile homes" under zoning ordinances are so common and the question of validity so likely to recur. The current cost of mobile homes and the severity of the "problem" in many locations is such that it seems to us that definitive rules of law with respect thereto are urgently necessary for the benefit of involved municipal officials and persons vitally concerned with the purchase, sale and "installation" of said structures.

For all of these reasons, we make the following

## ORDER

And now, August 27, 1974, it is ordered, adjudged and decreed that the appeal of Marsha Boyd from the decision of the Zoning Hearing Board of New Sewickley Township be, and it is hereby, sustained. The proper officers of the township are hereby ordered and directed to issue to Marsha Boyd the required permit.